[Crim. No. 1013.   In Bank.—January 16, 1904.]

THE PEOPLE, Respondent, v. JOSEPH TESHARA, Appellant.

CRIMINAL LAW—EVIDENCE—CROSS-EXAMINATION OF DEFENDANT.—A defendant in a criminal case who has by his testimony in chief contradicted the evidence for the prosecution may be cross-examined with reference to all facts or denials necessarily implied from his testimony in chief, as well as with respect to the facts expressly

stated by him in such testimony; and the cross-examination is not limited by the exact period of time fixed by the testimony in chief, but may extend to the whole transaction of which he gives a part, and which occurred in immediate connection with the part which he relates, shortly before or after, and in which he must have been concerned, and of which he may be reasonably supposed to have had knowledge.

APPEAL from a judgment of the Superior Court of Santa Cruz County and from an order denying a new trial. W. M. Conley, Judge, presiding.

The facts are stated in the opinion of the court.

Carl E. Lindsay, for Appellant.

U. S. Webb, Attorney-General, and C. N. Post, Assistant Attorney-General, for Respondent.

SHAW, J.—The defendant appeals from a judgment of conviction of murder in the second degree, and from an order denying his motion for a new trial. The error assigned is, that upon the trial the court allowed the prosecution in the cross-examination of the defendant to ask questions not relating to matter testified to by him upon the examination in chief.

There was no evidence for the prosecution showing the circumstances of the homicide other than that contained in the dying declaration of the deceased, Garrett D. Loucks. He was a saloon-keeper in Santa Cruz. According to this declaration, as illustrated by a map of the premises introduced in evidence, the defendant and one Manuel Amaya came into his saloon on the evening of February 10, 1900, and Teshara asked Loucks to play a game of pedro. They sat down in the cardroom (which was immediately behind the front room, or the barroom, as it is called) and played two games. Teshara then asked Amaya to play, but Amaya said he did not want to do so, and about that time Patrick Morrisey came into the saloon, and asked Teshara to take a drink with him. The two each drank, Morrisey left, and Loucks and Teshara played two more games and part of another, whereupon Amaya, who was sitting on a lounge behind Loucks, struck him over the head with something several times, and ran for the front door, the de-

ceased following him, and Teshara following behind the de-
ceased. When the deceased had reached the middle of the front
room, Amaya shot him in the breast, and Teshara, being still
behind Loucks, called out: "Kill him, kill him, don't let him
get away." Amaya then fired another shot, hitting Loucks in
the abdomen, and he fell. Shortly afterwards Loucks was
found in the saloon badly wounded. Two days afterwards he
died of the wounds. There was other testimony to the effect
that Teshara and Amaya had been seen together on that even-
ing shortly before the homicide, going toward the saloon. Mor-
risey also testified that he entered the saloon and treated
Teshara to a drink, as stated in the dying declaration.

In his examination in chief the defendant testified that he
had lived in Santa Cruz the greater part of his life; that he
knew Patrick Morrisey, and remembered that Morrisey came
into Loucks's saloon on the night of February 10, 1900; that
he had a drink with Morrisey on that occasion; that Morrisey
left the saloon; that two or three minutes afterwards the de-
fendant himself left the saloon and went to bed, leaving
Loucks standing behind the bar in the saloon, alive, uninjured,
and well, and that he did not again see Loucks that night. It
will be observed that the defendant gave no testimony what-
ever relating to any occurrence, in the saloon or elsewhere,
before the entrance of Morrisey; and that his relation of the
facts occurring at and subsequent to Morrisey's entrance cor-
respond exactly with Morrisey's statements during his pres-
ence, and differed entirely from the statements in the dying
declaration as to what took place after Morrisey's departure.

Upon cross-examination the district attorney began by ask-
ing questions relating to occurrences in the saloon prior to
Morrisey's entrance, to which objections were sustained by the
court. The district attorney then said: "I think I ought to
have a chance to show how he arrived at the saloon and who
was with him if any one," to which the court said, "I think
you will." A number of questions were then asked, in answer
to which the defendant testified that Patrick Morrisey was in
the saloon for a while; that after the defendant arrived at the
saloon he went into the cardroom and found deceased seated
at a table engaged in a game of solitaire; that they greeted
each other, and thereupon the deceased proposed a game of

pedro with him. Many of the questions were objected to, but two questions were asked which elicited the fact that Manuel Amaya was in the saloon with the defendant and went into the cardroom with him, and to these questions there was no objection, nor was there any motion to strike out the answers. The statement as to what took place after he went into the cardroom was given in answer to the question: "What did you do after you got into the cardroom?" During the answer to this question one or two minor questions were interjected, but the witness continued with his answer until he made the statement that the deceased had proposed a game of pedro. Thereupon the court interrupted, saying: "Strike out the last answer; ruling is reversed and the objection is sustained. You will have to confine yourself to matters brought out on direct examination, the cross-examination must be confined to those matters and nothing else." Thereafter the cross-examination proceeded at considerable length, during all of which the district attorney was rigidly limited to facts occurring at and after the time when Morrisey entered the saloon.

Many of the questions relating to occurrences when Morrisey was there, and afterwards were vigorously objected to by the defendant's counsel. We think there is manifestly no error in these questions. The defendant had attempted in his direct examination to state what occurred from the time Morrisey entered until he himself left the saloon, and his statements as to facts occurring after Morrisey left impliedly contradicted the dying declaration of the deceased. It was proper cross-examination for the prosecution to ask him concerning other matters that occurred during the time as to which he testified, and which he did not mention in his direct examination.

With respect to the facts elicited at the beginning of the cross-examination relating to matters occurring before the entrance of Morrisey, we are of the opinion that whatever there was of the evidence thus elicited that was injurious to the defendant was cured by the voluntary testimony of the defendant in the subsequent cross-examination. As to the evidence showing that a card game was proposed by Loucks, we do not perceive that it was harmful or material. In his cross-examination relating to the occurrences subsequent to Morrisey's entrance, the defendant testified that he was playing

the last hand in a card-game at a table in the cardroom at the time Morrisey entered. These facts being elicited, it was not particularly important to inquire how long he had previously been engaged in the game, nor who proposed it. With regard to the presence of Amaya in the room, the defendant in his subsequent examination volunteered the statement that Amaya was there prior to the entrance of Morrisey. The district attorney had asked him some questions relating to the position of the defendant at the time Morrisey entered the room. Thereupon this question was asked: "Q. Where was Manuel Amaya at this time?" An objection to this question was properly overruled, as the time referred to was the time of Morrisey's entrance. The answer was: "Manuel Amaya was seated in a chair on the opposite side of the table." The witness was then asked: "This has reference to the immediate time that Morrisey came in?" to which he answered: "Why, Amaya was not there at all at the time Patrick Morrisey came in, there was no one there outside of Mr. Loucks and I, Mr. Morrisey made the third party." Neither the court nor counsel could foresee that the witness would misunderstand the question with reference to the whereabouts of Amaya. There was no motion to strike out the answer, and hence it remained as part of the testimony, and fully disclosed to the jury the fact that Manuel Amaya had been in the saloon prior to the entrance of Patrick Morrisey. All this testimony, of course, to some extent corroborated the dying declaration, but in so far as it was objected to we do not think it transcended the limits of cross-examination.

We have discussed the case so far upon the theory that any inquiry as to the occurrences in the saloon prior to Morrisey's entrance would not have been proper cross-examination. We are of the opinion, however, that the limits of proper cross-examination were not exceeded, even if the objections made should be considered as properly applying to all the questions with respect to such prior occurrences which were answered by the defendant, and even if the facts disclosed were material.

The statement of the deceased showed that the defendant and Amaya had entered the saloon together that evening and had remained there until after Morrisey departed; that Amaya, in the presence of Teshara, then struck and shot the deceased; that Teshara encouraged Amaya to kill the de-

ceased, whereupon Amaya shot again, and that when Teshara
left the saloon the deceased had received his death-wound
and had fallen to the floor.    Teshara's direct testimony
showed, in effect, that he did nothing in the saloon except to
drink with Morrisey, and that he went away a few minutes
afterward, leaving Loucks in the saloon alone, alive, well, and
uninjured, standing behind the bar.    It was equivalent to a
denial of all the facts stated by Loucks as occurring after the
departure of Morrisey, and therefore to a denial of any part
in, or knowledge of, the killing, and of any participation with
Amaya in the offense.    A defendant cannot, by testifying to
a state of things contrary to and inconsistent with the evi-
dence of the prosecution, thus indirectly denying the testi-
mony against him, but without testifying expressly with
relation to the same facts, limit the cross-examination to the
precise facts concerning which he testifies.    He can be cross-
examined with respect to facts or denials which are necessarily
implied from the testimony in chief, as well as with respect to
facts which he expressly states.    And he cannot, by beginning
his narrative at a particular moment of the occurrence, limit
the cross-examination to the same exact period.    The cross-
examination may extend to the whole transaction, of which
he gives a part, and which occurred in immediate connection
with the part he relates, shortly before or after, and in which
he must have been concerned, or of which he may be reason-
ably supposed to have had knowledge.    Therefore it was
proper to ask him with respect to things which occurred in
the saloon that evening after he entered and in his presence or
hearing, and also concerning the persons who were with him
at and after the time of his arrival.    In substance and effect
he had denied that Amaya was in the saloon at the time he
left.    It was proper to show, if possible, on his cross-examina-
tion, that Amaya and he came there in company and re-
mained there together for a considerable part of the evening
preceding the time when he chose to begin his narrative of
events.    It would tend to some extent to show that Amaya
was there after Morrisey departed, and to contradict to that
extent his implied denial of Amaya's presence there at all
after that time.    Also, it was proper to prove the previous
games of cards to impeach his implied denial that any games

were played immediately preceding his own departure. Both Loucks and Morrisey said that Morrisey when he came in had interrupted the game of cards at which Loucks and defendant were engaged. If the games had been going on for some time before the interruption, it would furnish some slight ground for an inference that the play was resumed after Morrisey left.

No other questions are presented upon the record.

It is therefore ordered that the judgment and order appealed from be affirmed.

Angellotti, J., Lorigan, J., Henshaw, J., Van Dyke, J., and Beatty, C. J., concurred.