[Crim. No. 2298. First Dist., Div. One. Nov. 22, 1944.]

THE PEOPLE, Respondent, v. GEORGE PEAK, Appellant.

Leo R. Friedman and Wm. H. Penaat for Appellant.

Robert W. Kenny, Attorney General, David K. Lener, Deputy Attorney General, and Harold J. Haley, District Attorney, for Respondent.

WARD, J.—The appellant, George Peak, shot and seriously wounded his daughter Jane Epidendio and her husband Ernest Epidendio with a shotgun during a family dispute over the attempted removal by the Epidendios of certain furniture and personal belongings of which they were the owners from a dwelling owned by Ernest Epidendio and in which appellant was then living. There was but one shot fired, and appellant was charged in one indictment, containing two counts, with violating section 245 of the Penal Code—assault with a deadly weapon. He was found guilty by a jury on each count and he appeals from the judgments of conviction and the orders denying his motions for new trial.

Ernest Epidendio who with his wife Jane operated a grocery store in Larkspur, Marin County, lived at 12 Sycamore Street, which property belonged to him. Upon Ernest's induction into the United States Army, Jane invited her parents to live with her at the Sycamore Street residence. Prior to such time the Peaks had been caring for the child of the Epidendios. For this they were paid $35 a month in cash and given a $15 drawing account on the grocery store. At the time they took up their residence with Mrs. Epidendio it was agreed that the $35 a month payment should cease; that the Peaks were to pay no rental; that Mrs. Epidendio was to pay the bills for the utilities and furnish the groceries; that Mrs. Peak was to buy all the meat. Shortly thereafter, members of Ernest's family who had assisted his wife at the store after he went into the service, being unable to continue such work, Mrs. Epidendio arranged for her father to help her with the business. At first he refused to accept payments, but finally agreed to take $35 a week for four weeks and thereafter $50

a week, also one-half of the profits of the store during the time of his employment. Mrs. Epidendio said she made the payments of salary in cash and kept no record of them; Mr. Peak denied that he was paid any salary.

Upon Ernest's discharge from the army he returned to the Sycamore Street address and the two families lived together. Discord developed almost immediately, however, and the record is replete with recitals of quarrels, during some of which Mrs. Epidendio persuaded her husband to leave the house in order to avoid any violence. Shortly after Ernest's return, Mr. Peak ceased to report for duty at the store, and Ernest tendered him a check for $585 which he said represented as nearly as he could figure one-half of the profits of the business during the time of Peak's employment. Peak did not accept the check, and Mrs. Epidendio claims the trouble started when her father claimed he was being cheated and wanted more money. Owing to the continued discord, Epidendio and his wife moved to an apartment over their store, taking with them only what clothing they needed for immediate use. From time to time Mrs. Epidendio went back to the house and procured articles of clothing for herself and her husband, trying all the while to persuade her parents to leave so that she and her husband could move back into their home. On such occasions arguments developed and bitter words were exchanged.

On November 14th, Ernest, his wife, two of his brothers and four other men in two trucks, one a moving van, proceeded to the Sycamore Street residence. Upon their arrival the party alighted from the trucks and started to ascend the stairs of the dwelling. Mrs. Epidendio was leading, and as she opened the screen door and inserted her key in the lock, her mother came to the inside of the door, threw on the safety catch and called Mr. Peak. Mrs. Epidendio states that she told her mother that since the Peaks would not move out, she and her husband wanted to remove their furniture and belongings. Her mother said she was told they had come to move the furniture and to dispossess her parents at the same time. The father had in the meantime come to the front of the house and could be seen through the front room window at the left of the outside door. He had pulled aside the curtain and was pointing a double barreled shotgun at his daughter. Calling vile names he threatened to shoot unless the party departed. Mrs. Epidendio told him to go ahead; she

believed "he was too yellow." Since entrance to the house could not be gained Mrs. Epidendio left, going to the Assistant Chief of Police of Larkspur, to whom she gave an account of the happenings. She then returned to her apartment, armed herself with a small gun and went back to the scene of the trouble. Upon her arrival there the gun was immediately taken away from her by one of her husband's brothers, who put it in his truck. Mr. and Mrs. Epidendio then left with the moving man—who had arrived at the conclusion by this time that his services would not be required—and called their attorney, who advised them to take their personal possessions but to leave the furniture. They accordingly went again to the house and, with their friends once more ascended the stairs, Mrs. Epidendio telling her parents that she had been advised by her attorney that she had the right to take her personal effects. She saw her father just inside the door with the gun still in his hands—and he threatened to shoot if they did not go away. Ernest opened the screen door and put his key in the lock. At the same instant Peak discharged the gun through the glass partition of the door, injuring his daughter in both legs and feet, and her husband in one foot.

Appellant contends that the state failed to establish any intent on his part to injure or inflict bodily harm upon any person. "An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (Pen. Code, § 240.) "Every person who commits an assault upon the person of another with a deadly weapon or instrument, or by any means of force likely to produce great bodily injury is punishable" as provided by section 245 of the Penal Code. ■ The difference between the offenses referred to in sections 240 and 245 is that in the latter a deadly weapon is involved. (*In re Shull*, 23 Cal. 2d 745 [146 P.2d 417].) In the simple assault offense there must be an ability and an attempt to commit the offense. In the greater offense the character of the weapon and the method of its use become an essential of the offense. (*People* v. *McCoy*, *(Cal.App.) 147 P.2d 54; *People* v. *Cook*, 15 Cal.2d 507 [102 P.2d 752].)

■ In the offense of assault with a deadly weapon, malice is not an element of the crime; an intent to use the deadly in-

---

*In *People* v. *McCoy* a hearing in the Supreme Court was granted on April 13, 1944. The final opinion of the Supreme Court is reported in 25 Cal.2d 177 [153 P.2d 315].

strument may be implied from the manner of its use. If the act is wrongful and the firing of a gun under the circumstances is unlawful, the intent may be inferred from the method used, including the position of the parties and all of the surrounding circumstances. ''Where the act is both unlawful and wrongful, and well calculated to inflict serious personal injury, the law will imply malice and an unlawful intention and override any actual intention existing in the mind of the aggressor. Thus, while it is not an assault to fire a gun in the air for the purpose of frightening another, it is an assault, without regard to the aggressor's intention, to fire a gun at another or in the direction in which he is standing. The law will not tolerate such a reckless disregard for human life.'' (4 Am.Jur., p. 130, § 6.) (See 3 Cal.Jur., pp. 202-203, § 19; *People* v. *Leyba,* 74 Cal. 407 [16 P. 200] ; *People* v. *Lim Dum Dong,* 26 Cal. App.2d 135 [78 P.2d 1026] ; *People* v. *Bumbaugh,* 48 Cal.App.2d 791 [120 P.2d 703].) ▮ In the present case, the manner of the use of the shotgun and other circumstances are all questions of fact that may be decided by the jury. The implied finding in the verdict—that a felonious assault as designated in Penal Code, section 245, had been committed by appellant—may be sustained. (*People* v. *Bumbaugh, supra.*)

The cases cited by appellant as holding that in the offense of assault with a deadly weapon there must be a specific intent, do not go that far. A fair sample is *People* v. *Dodel,* 77 Cal. 293 [19 P. 484]. In the Dodel case the defendant, moving away from the complainant, had a knife in his hand but did not use or attempt to use it. Two instructions are there criticized, the gist of the second being that there must have been an attempt to use the weapon. ▮ The drawing of a weapon, the manner in which it was held, and the statements made, if any, by the holder of the instrument are all circumstances which may be considered in determining whether there was in fact an assault with a deadly weapon. (*People* v. *Adams,* 76 Cal.App. 188 [244 P. 114].)

The court instructed the jury that in the offense of assault with a deadly weapon no specific intent is necessary, and gave additional instructions upholding the first principle criticized. The cases cited involve offenses wherein specific intent must be proved, viz., assault with intent to commit rape (*People* v. *Johnson,* 106 Cal. 289 [39 P. 622] ), murder (*People* v. *Jones,*

160 Cal. 358 [117 P. 176]; *People* v. *Flannelly,* 128 Cal. 83 [60 P. 670]) and assault with intent to commit murder (*People* v. *Mize,* 80 Cal. 41 [22 P. 80]; *People* v. *Miller,* 2 Cal.2d 527 [42 P.2d 308] and *People* v. *Snyder,* 15 Cal.2d 706 [104 P.2d 639]). The latter offense is the nearest approach to the offense of assault with a deadly weapon. ■ In the assault to murder, the crime must be proved by evidence or inferences reasonably deducible therefrom that there was a specific intent to kill; the specific intent to kill is lacking in the offense where the assault is made only to produce bodily injury. ■ In such a case the means or instrument used, together with other circumstances, is sufficient proof of the general intent to inflict bodily injury.

In every public offense there must exist a joint operation of act and intent, or criminal negligence. (Pen. Code, § 20.) There are some crimes in which a wrongful intent is presumed based solely upon the commission of the act itself. ■ If intent is not made an affirmative element in an offense performed knowingly, the law imputes a criminal intent. The law assumes an intent as an essential of a crime. Even in a case where the felony is designed and the life of another is taken accidentally the law presumes an intent to kill. ■ It is only in offenses where the voluntary commission of an unlawful act is based upon the essential element of specific intent that intent should be alleged and proved. The element of criminal negligence is a substitute for proof of specific intent. (Pen. Code, §§ 7, 8, 20, 21, 26; 7 Cal.Jur., pp. 850-851 § 11 et seq.; 14 Am.Jur., p. 782 et seq., §23.) ■ In the present case there is evidence that appellant had made threats to shoot Ernest Epidendio. If believed, that evidence, together with the actual shooting and the surrounding circumstances, is sufficient proof of the offense charged in view of the fact that the appellant's explanation was not acceptable to the jury.

At the time of the trial appellant's attorney had in his possession six letters written from Jane to Ernest and one from Ernest to Jane. It is contended that the letters establish the cordial relationship existing between Jane and her father during the absence of Ernest in the army, and that "They disclosed a background showing animosity on the part of Ernest Epidendio's family toward defendant and established a condition showing that this animosity would operate upon

Ernest Epidendio to the extent of causing him in turn to entertain animosity toward the defendant.'' Several of the letters were read by Jane to her mother before mailing. These letters were admitted in evidence upon the theory that Jane had waived the privilege by publication of their contents to her mother. All of the letters were obtained by the mother from the bottom drawer of a dresser in the bedroom used by Jane and Ernest or from other places in the house.

The admissibility of the letter written by Ernest to Jane, marked as an exhibit for identification, may be disposed of immediately. it reads: ''Hello Sweetheart I just received your letter and Alice's [Ernest's sister] as well and it sure upset me an awful lot to hear about your misunderstanding you two had. I wrote Alice and told her to tell you that Im sure she did not know what she was saying after all if it wasnt for your Dad that the store would have had to close in two weeks if it depended on my family. So Honey I want you to do me this one favor and please keep peace in the families and gives Alice another Chance at least to help while you are away with me in New York wont you please? Well honey as always I sure cant tell you how much I really love you and hope you feel the same.'' This letter, written in the month of August, 1943, does not show animosity on the part of Ernest to the defendant Peak, or that Jane after reading the letter held any animosity toward her father. It does not indicate favoritism on the part of Ernest for his own family, and was not proper impeaching evidence of any statement made by Ernest based upon facts which were not discovered until his return from the army in September, 1943.

The purpose of section 1881 of the Code of Civil Procedure is to hold intact the confidence which naturally arises from the relationship of husband and wife. It is not the act of communication but the substance thereof that is held legally inviolate. The propriety of the rules covering the admission of written communications between husband and wife which have fallen into the hands of third parties, is similar to the oral communications rule; that is, conversations between spouses overheard by a third party. ''. . . the rule is well settled that a third person who overhears a communication between husband and wife, whether with or without their knowledge, and whether surreptitiously or openly, may testify regarding what he thus learns, although

the communication may be, as between the husband and wife, one of a confidential character." (63 A.L.R., pp. 108-109.) "For, even though a conversation between a husband and wife was intended to be confidential, a third person who overheard it, whether his presence was known or not, may testify as to what was said. 40 Cyc. p. 2359; *State* v. *Center*, 35 Vt. 378; 5 Wigmore, Ev. 2d ed., secs. 2339, and 2326." (*Nash* v. *Fidelity-Phenix Fire Insurance Co.*, 106 W.Va. 672 [146 S.E. 726, 63 A.L.R. 101, 104].)

Evidence produced by third parties without connivance of a spouse, or obtained without the use of force or violence upon a spouse but merely by accident or by design of the third party, is similar to oral admissions accidentally or designedly overheard. ■■■ "In criminal prosecutions, in particular, evidence is frequently obtained by methods that are morally reprehensible and offensive to fair dealing, under circumstances which meet with disapprobation of the courts, and, in many instances, by means that are illegal. If, however, evidence offered in support of a fact in issue is relevant and otherwise competent, it is generally admissible, although it may have been obtained unethically, wrongfully, or unlawfully or illegally, as where it was secured by trespass, unless its admission will violate a constitutional guarantee of the person against whom its admission is sought or is in contravention of a statutory enactment." (20 Am.Jur., pp. 352-353, § 393.) ■■■ When obtained by design the means of obtaining the evidence is not legally excused, but in the interest of justice it is ignored upon the theory that the wrongful invasion of premises is a matter for which ample remedies are provided. It is not the search and seizure but the *unreasonable* search and seizure which is condemned. (*United States* v. *Bell*, 48 F.Supp. 986.) (See, also, Wigmore on Evidence, 3d ed., vol. VIII, §2183 et seq.)

It is true that various jurisdictions are not entirely in harmony with the above stated principles that redress for wrongful possession is not the exclusion of pertinent evidence, so we turn to California decisions which must be accepted as the guidepost directing the rule to follow. In 8 California Jurisprudence, page 78, section 178, it is set forth: ". . . that it is no objection to papers or other subjects of evidence which are pertinent to the issue that they were illegally taken from the possession of the party against whom they are of-

fered or were otherwise unlawfully obtained. This rule is based upon the doctrine that when evidence is offered, the court will consider only its competency and not a collateral issue as to the method by which it was obtained." (See *People* v. *Mayen*, 188 Cal. 237 [205 P. 435, 24 A.L.R. 1383]; *People* v. *LeDoux*, 155 Cal. 535 [102 P. 517]; *People* v. *Kelley*, 22 Cal.2d 169 [137 P.2d 1]; *People* v. *Gonzales*, 20 Cal.2d 165 [124 P.2d 44]; *People* v. *Eiseman*, 78 Cal.App. 223 [248 P. 716]; *People* v. *Beilfuss*, 59 Cal.App.2d 83 [138 P.2d 332]; *In re Ajuria*, 188 Cal. 799 [207 P. 516]; *People* v. *Hrjak*, 85 Cal.App. 301 [259 P. 353]; *People* v. *Cook*, 148 Cal. 334 [83 P. 43].) In *People* v. *Gonzales*, it was held one may have civil and criminal remedies against the illegal act of taking property but the state is not precluded from using evidence so obtained. At page 169 the court said: " . . the accepted rule in this state, as in many others, permits the introduction of improperly obtained evidence on the ground that the illegality of the search and seizure does not affect the admissibility of the evidence." If the state may use such evidence to prove guilt there does not appear any logical reason why the accused may not in such manner prove innocence or raise a reasonable doubt as to guilt.

We have considered subdivision 1 of section 1881 as applied to the facts herein and have concluded that all of the letters were admissible when limited to a consideration of that particular section but not otherwise. "We are not convinced that said section was intended in any case to shield a party to an action and deprive the adversary of the benefit of the testimony of such party." (*In re Strand*, 123 Cal. App. 170, 172 [11 P.2d 89].) "If it be conceded that the letter was illegally obtained, this would not operate to exclude it from evidence on the ground that it was a privileged communication, or that the evidence was self-incriminating. Though papers and other subjects of evidence may have been illegally taken from the possession of the party against whom they are offered, or otherwise unlawfully obtained, this is no valid objection to their admissibility if they are pertinent to the issue. (1 Greenleaf on Evidence, 16th ed., § 254a.)" (*People* v. *Swaile*, 12 Cal.App. 192, 196 [107 P. 134], approved in *People* v. *Baender*, 68 Cal.App. 49 [228 P. 536].) ▇▇▇ The People, in a criminal proceeding against one spouse, may prove declaration of the other spouse if otherwise admissible.

In other words by code provision one spouse may be an incompetent witness against the other, but the statements of one spouse made to some one else may be proven by competent testimony. (*People* v. *Chadwick*, 4 Cal.App. 63 [87 P. 384, 389]; *First Nat. Bank* v. *DeMoulin*, 56 Cal.App. 313 [205 P. 92]; *People* v. *Cook*, 148 Cal. 334 [83 P. 43].) In *People* v. *Mitchell*, 61 Cal.App. 569, 573 [215 P. 117], the court said: ''While defendant's wife was not a witness on the trial, counsel for defendant contends that the letter was inadmissible under the provisions of section 1322 of the Penal Code, which provides in effect that the wife is not a competent witness against the husband in a criminal action. The evidence shows that this particular letter was found on the floor of a cabin shortly after defendant's wife had removed therefrom. If it may be assumed that defendant's wife could not have testified as to the contents of the letter, it does not follow that no one else who read the letter might not do so. It is analogous to the situation of testimony by a witness who overheard a conversation between husband and wife.'' (*Lloyd* v. *Pennie*, 50 F. 4; *People* v. *Morhar*, 78 Cal.App. 380 [248 P. 975].)

It appears from the last quotation that, irrespective of a confidential relationship existing between Jane and Ernest, Jane's mother, Mrs. Peak, who found the letters in various parts of the house, could have testified as to their contents. In *Commonwealth* v. *Everson*, 123 Ky. 330 [96 S.W. 460, 124 Am.St.Rep. 365] it was held that neither the husband nor the wife could testify to a confidential conversation but that an eavesdropping housekeeper might do so. In *People* v. *Baender, supra,* a wife, the recipient of a letter from her husband, did not testify, but her attorney appeared as a witness and the letter in question was so introduced in evidence. The letter under the particular circumstances in the case was admissible, waiver or no waiver. (*People* v. *Mitchell, supra; People* v. *Morhar, supra.*)

One of the letters from Jane to Ernest introduced herein contains the following: ''. . . if your wise when you come back you will ask dad to continue helping you because he knows all the answers to keep us out of trouble. . . . Alice didn't even say Happy Birthday so if that's the way it is and she is only nice to me to get things from you in your next letter I wish you would ask her to get another job because if I stay home they couldn't run the business and your dad hasn't been in for a week so unless I can have people around

me that like me I am not going to work. Well, that's enough of self pity but I know just what will happen when you come back; the family will be all around you and tell you all things they did, and you will hold the same resentment toward dad you have always had.'' The other letters, introduced and not introduced as they appear in the record, are not additional evidence of a different character (Code Civ. Proc., § 1939) but merely evidence of the same character to the same point or, in a word, cumulative (Code Civ. Proc., § 1938). Under the circumstances the rejection of some of the letters was not error.

The additional letters, written previously and subsequently but all within a period of approximately six weeks, merely reiterate a direct disapproval of Alice, a criticism of other relatives of Ernest and an approval of Jane's ''Dad.'' It does not appear that the rejection of the additional evidence in any respect was prejudicial to the interests of the appellant. The general rule is that if a party is not prejudiced thereby the court in its discretion may limit the number of witnesses or the number of documents to prove a particular link in a chain of evidence. (26 R.C.L., p. 1033, § 37.) The court may exercise a reasonable control over the sufficiency of evidence upon a particular point. (Code Civ. Proc., § 2044; *Estate of Wineteer,* 176 Cal. 28 [167 P. 516] ; *Sheridan* v. *Sheridan,* 15 Cal.App.2d 200 [59 P.2d 175] ; *Estate of Haupt,* 200 Cal. 147 [252 P. 597] ; *People* v. *Garbutt,* 197 Cal. 200 [239 P. 1080] ; *Walter* v. *England,* 133 Cal.App. 676, 689 [24 P.2d 930] ; *People* v. *Tou Jue,* 66 Cal.App. 235 [225 P. 759].)

It is suggested that defendant shot to protect himself and his family. Instructions were given on self-defense and defense of habitation. A number of conclusions could have been reached by the jury. It is true there is testimony by the appellant that the Epidendios approached the premises in a loud and tumultuous manner, and there is evidence of previous quarrels during which Ernest left his own home to avoid trouble. There is evidence to warrant the conclusion that after the first appearance of the daughter on the premises on the day in question appellant invited a continuation of the dispute for the purpose of claiming the shot was in self-defense. There is evidence that Peak was in fear of harm to himself and his wife. There is evidence from which the jury could have concluded beyond a reasonable doubt that he was

not acting to protect himself and his family. The jury evidently reached the latter conclusion.

The court instructed that there is "a distinction in relationship between the owner or proprietor and a guest on the one hand, and that of landlord and tenant on the other. As a matter of law a tenant has an interest in the real estate and, among other things, he is entitled to the exclusive possession of the leased property. On the other hand, a guest has no interest in the real estate, of which a residence is a part. He is a mere licensee. He has merely the use of the premises, or a portion of the premises, without the actual or exclusive possession which remains in the owner.

"If you believe from the evidence beyond a reasonable doubt and to a moral certainty that the defendant was not a tenant of ERNEST EPIDENDIO and that he was not entitled to the exclusive use and occupancy of the premises owned by said ERNEST EPIDENDIO at 12 Sycamore Street, in the City of Larkspur, County of Marin, State of California, but that said defendant was using said premises as a licensee of said ERNEST EPIDENDIO, then the defendant did not have the right to exclude said ERNEST EPIDENDIO and JANE EPIDENDIO, his wife, therefrom, nor did he have the right to use any force or violence to prevent them, or either of them, from entering said premises together, and any assault with a deadly weapon by the defendant upon said ERNEST EPIDENDIO and JANE EPIDENDIO, while they, or either of them, were entering or attempting to enter the said premises together, would not be justified."

The first paragraph is a correct statement of the law although the relationship established by the oral hiring or renting of room space depends upon the contract, construed in the light of the intention of the parties, which may be gained from statements made by them and the circumstances surrounding the execution of the contract.

The second paragraph must be read in connection with other instructions and then applied to the evidence. When that is done appellant's criticism that the jury was told to find him guilty no matter what the circumstances were under which the Epidendios sought to enter the premises, even if they were attempting to enter for an unlawful purpose or in an unlawful manner, or to inflict great injury upon defendant etc., is not well founded. When the instructions

are read as a whole the law in this respect seems to have been fairly stated and if error occurred the appellant seems to have been favored.

Though not so claimed by appellant, it has been suggested that the instruction is a formula instruction, and that a specific rule applies that would otherwise not be applicable. "It is doubtless the rule that where a so-called 'formula' instruction is given, directing a verdict in the event the jury finds certain facts to be true, it must embrace all the elements essential to a recovery, and that the omission therefrom of any of such elements amounts to error, the prejudicial effect of which is not overcome by the inclusion of the omitted elements in other instructions." (*Edgar* v. *Citraro*, 112 Cal.App. 163, 167 [297 P. 645].)

The instruction above is divided into two parts; the first paragraph simply states the law; the second is not in fact a formula instruction. It does not assume to be a complete statement of the law upon which the jury may base a verdict, ignoring all other instructions. (*Harvey* v. *Aceves*, 115 Cal. App. 333 [1 P.2d 1043].) It does not, standing alone as set forth in the instruction, state a premise which, if found to be true, would warrant the jury finding the appellant guilty. It simply states certain facts found to be true upon which a finding of assault with a deadly weapon "would not be justified." There may be other circumstances justifying the use of a deadly weapon that are set forth in other instructions.

It is contended by appellant that the instruction ignores and sets aside the doctrine of self-defense. In other words, that it should contain the elements of self-defense. It is often impossible to frame an instruction containing all the essentials so that laymen may intelligently follow the law and apply it to facts. Instructions at the request of appellant were given to the jury under the provisions of Penal Code, section 197; also the following were given: "The conditions under which the right of self-defense may be asserted are: First, that the party against whom the threat of serious bodily injury exists was not himself at fault or the first aggressor; and Second, that the shooting was necessary to prevent the infliction upon himself or his wife or child of a great bodily injury by the other person. Where one is without fault and is placed under circumstances sufficient to excite the fears of a reasonable person that another designs to commit some great bodily in-

jury upon him, or his wife or child, and to afford ground for the reasonable belief that there is imminent danger of the accomplishment of this design, such person may, acting under these fears alone, shoot or slay the assailant and be justified in so doing by the appearances." "If the circumstances were such as to justify a reasonable person in believing the danger of. injury to himself or to his wife or to his child would be imminent he may act upon these appearances alone and be justified in so doing." The jury was instructed upon every phase of self-defense suggested by the appellant.

Appellant suggests that a definition of licensee is not contained in one of the instructions. If it was intended that such instruction was, or if it might be reasonably construed to be, a formula instruction, and no other instruction contained a definition of licensee the point might be worthy of some further consideration. It is not a formula instruction and we fail to find any instruction on the definition of guest or licensee submitted by appellant that was not given. "If they harmonize as a whole and fairly and accurately state the law, a reversal may not be had because of verbal inaccuracies, or because a separate instruction does not contain all of the elements which are to be gathered from the instructions as a whole. (*Douglas* v. *Southern Pacific Co.*, 203 Cal. 390, 396 [264 P. 237] ; *De La Torre* v. *Johnson*, 203 Cal. 374, 377 [264 P. 485].)" (*Westover* v. *City of Los Angeles*, 20 Cal.2d 635, 637 [128 P.2d 350].)

 There is evidence to show that appellant and his family were guests of the Epidendios. Assuming, however, that they had a right as tenants to live in the house, the right was a common one with the son-in-law and daughter. Under either circumstance appellant was not justified in preventing the Epidendios from obtaining their personal belongings unless in the entry or attempt to enter an unwarranted assault by the Epidendios or their agents occurred. The evidence does not show such conduct on the part of the Epidendios. They had a right to enter and they made no assault upon Peak or his wife.

It is contended that the court erred in embodying in the instructions Penal Code, section 1127c, covering the subject of flight. Flight, standing alone, is not sufficient to establish guilt, but flight immediately after the commission of an offense or after one is accused of a crime is a circumstance that may be considered and is a matter for the jury to de-

termine. Appellant disappeared the day the grand jury returned the indictment against him, remained away for approximately one week and then returned and surrendered. Whether he knew that the indictment would be or had been filed, his intention in leaving and his intention in returning are all matters to be determined by the jury upon the facts as presented. We are not prepared to say from the record presented that the giving of such an instruction in this case was without evidentiary support.

Appellant testified that when he looked out of the window on the morning in question he saw ''Shorty'' Miller with an iron bar in his hand. There is no testimony that the bar was used or that a threat to use it was made. Miller was called in rebuttal and admitted his presence on the porch but denied that he had an iron bar or any weapon in his hand or possession. He also stated on cross-examination that the Epidendios lived with him. He was asked the following: [1] Tell me everything you did from the time you got there until you left. . . . [2] Who else was on the porch with you? . . . [3] What were you doing? What did you go there for? . . . [4] Had they lived up there with you before?'' The record shows that the second and fourth questions were answered by the witness. The first question is rather broad and might call for a lengthy dissertation on irrelevant and immaterial matters. Certainly the trial judge did not abuse his discretion. The first part of the third question had been answered, and the answer to the latter part—what did you go there for—appears numerous times. The jury was certainly not led astray by the court's ruling on that question.

The entire transcript discloses that the appellant was tried ably and fairly by court and counsel and that the jury could not conscientiously have returned any other verdict.

The judgments and orders denying motions for new trial on counts one and two of the indictment are affirmed.

Knight, J., concurred.

PETERS, P. J.—I dissent.

An examination of the record discloses that during the course of this trial at least three serious errors were committed. In my opinion, when these errors are considered in the light of the closeness of the case on the evidence, they were prejudicial, and warrant a reversal.

The first of these errors relates to some six letters passing

between Jane and Ernest Epidendio, the two complaining witnesses, while Ernest was in the army. The trial court sustained objections to the admission of these letters on the sole ground that they were privileged communications between husband and wife, even though the evidence disclosed that the letters had fallen into the hands of Mrs. Peak. The majority opinion holds that "all of the letters were admissible when limited to a consideration of that particular section [Code Civ. Proc., § 1881, subd. 1] but not otherwise." It should be here pointed out, that in the trial court the only objections to these letters were that they were privileged, and that they tended to impeach certain witnesses only as to collateral issues. The trial court overruled this second objection, but excluded the letters solely upon the ground that they were privileged. We are all agreed that the letters were not privileged, and that in this respect the trial court was in error. The majority opinion, however, holds that it was not error for the trial court to exclude these letters because they were "merely evidence of the same character to the same point or, in a word, cumulative. (Code Civ. Proc., § 1938.) Under the circumstances the rejection of some of the letters was not error." The majority opinion then relies on the well settled rule that a trial court "in its discretion may limit the number of witnesses or the number of documents to prove a particular link in a chain of evidence." The obvious fallacy in this reasoning is that the trial court, in whom the discretion vests, has never exercised that discretion in this case. Here the trial judge obviously believed the letters were pertinent, but erroneously believed they were privileged. The majority opinion seeks to substitute the discretion of an appellate court for that of the trial judge.

In an attempt to show that the improper rejection of these letters was not prejudicial, the majority opinion quotes a part of one paragraph from one letter that was admitted, and then concludes that the rejected letters were "merely" cumulative evidence to the same effect. This, in my opinion, is not a fair characterization of these letters. When read as a group, the excluded letters disclose that during Ernest's absence while in the army, the store was kept open largely because of the initiative and hard work of appellant. They further disclose that there was bitter feeling between the Epidendios and the Peaks; that the divorce between Jane and Ernest had been caused by the unreasonable demands of the Epidendios upon

their son; that the sister of Ernest had quarrelled with Jane over the management of the store, and had accused Jane of wasting Ernest's money; that Jane had been forced to fire this girl; that the Epidendios were jealous because Jane's father was helping to operate the store and because Jane had not turned the very profitable business over to them when Ernest went into the army. One letter told Ernest that if he was going to let his family order him around, as he had in the past, that they had better close up the store and move away.

These letters were most important. They disclose that while Ernest was in the army, both Jane and Ernest were deeply appreciative of appellant's efforts on their behalf, that the relationship between Jane and Ernest and appellant was then most harmonious, and that appellant had done an outstanding job for them. Ernest had testified on the trial that appellant had done nothing out of the ordinary while Ernest was in the army, and Jane had testified that the business would not have closed even though appellant had not assisted her. Jane testified that neither her brother-in-law nor sister-in-law, while Ernest was in the army, attempted to create trouble between Ernest and her. The letters directly impeach this testimony. Of even greater importance, the jury could have inferred from these letters, had they been admitted, that the Epidendio family must have provoked a feeling of antagonism between appellant and Ernest and Jane after Ernest's return, and the letters directly show what the motive of the Epidendio family was. It is true that some of these facts appear in the quoted letter. But all of them do not appear in that letter. These letters proved the background of the controversy between the two families by the very words of the two prosecuting witnesses. To refer to such testimony as "merely" cumulative, as does the majority opinion, is to close one's eyes to the realities of the situation. Had the trial judge attempted to exercise his discretion and excluded these letters on the ground that they were merely cumulative, which he did not, we would have been compelled to hold that he abused his discretion. In my opinion, this error was most prejudicial.

To understand the seriousness of this, and the other errors to which reference will hereafter be made, some reference must be made to the evidence. This is so, because to ascertain whether a particular error is or is not prejudicial the entire

record must be considered, including the evidence favorable to the defense. While an appellate court has no power to weigh the evidence, under section 4½ of art. VI of the Constitution, in determining whether an error is prejudicial, the appellate court must make an examination "of the entire cause, including the evidence" in order to ascertain whether "the error complained of has resulted in a miscarriage of justice." I have no doubt that the evidence recited in the majority opinion supports the judgment. But if error has been committed, as I believe it has, then the court is under a duty not only to consider the prosecution's evidence, but to consider the evidence as a whole, in order to ascertain the seriousness of the error. It is obvious that if the evidence is overwhelming in favor of the prosecution, or even if the weight of the evidence strongly favors the prosecution, a particular error may properly be held to be nonprejudicial. But if the case is a close one, with the evidence about evenly divided, it is equally obvious that the identical error may then be found to be prejudicial.

It will be noted that the majority opinion does not expressly hold that the evidence is overwhelming, or that it even preponderates in favor of the prosecution. However, towards the end of the opinion, it is stated "that the jury could not conscientiously have returned any other verdict." Such statement, in my opinion, is totally unwarranted by the record. It is not supported by any analysis of appellant's testimony. An examination of the record, far from showing that no other verdict could "conscientiously" have been returned, demonstrates to a certainty that the case was a very close one on the facts. Stated another way, there was ample, substantial evidence, which, if believed by the jury, would have compelled a "conscientious" jury to acquit the appellant.

The evidence produced by the prosecution, and recited in part in the majority opinion, supports the implied findings of the jury that appellant was an irascible man and a troublemaker, who, without lawful cause, committed an unjustifiable and most serious assault with a deadly weapon on his daughter and her husband. On the other hand, there is some evidence that bad feeling existed between the Epidendio family and that of Peak, and that such feeling was the fault of the Epidendios. The whole basis of the defense was that Peak knew of this ill feeling, and that when seven men and his daughter,

in a loud and boisterous manner, attempted to secure access to the house, he was in fear of injury to his wife or to himself; that he fired only after Willie Epidendio had kicked in the door and after threats had been made against his life. There is substantial evidence to support this defense. It is an admitted fact that on the morning of November 14th, seven men and Jane Epidendio arrived at 12 Sycamore Avenue in two trucks. The prosecution claimed, and offered evidence to prove, that they came only to remove the furniture and personal effects belonging to Jane and Ernest. The evidence shows that the only furniture Jane and Ernest had in the house was a living room set, two bedroom sets, a breakfast room set, and some kitchen furniture. The balance of the furniture belonged to appellant and his wife. Jane and Ernest admitted that they had made no arrangements for the storage of the furniture, and that it could not have been taken to the place in which they were then living. Incidentally, after the shooting, and up to the time of trial, the furniture had not been moved, and Jane and Ernest had not moved into the house, although the Peaks had moved out. There was evidence that when the crowd first arrived on the porch Jane yelled that they had come to move the furniture and the Peaks out of the house and that ''she had been told she had a perfect legal right to use any force whatever to come in the house'' to accomplish these results. Under such circumstances, the appearance of seven grown men to move this small amount of furniture, particularly in view of the threats made and the past relationship of the parties, might well have led a reasonable man to believe that this large group was there for some other purpose than merely to move the furniture.

There was substantial evidence not only of appellant, his wife, and their son, but also of a neighbor, Mrs. Campbell, that the seven men approached the house in a loud and tumultuous manner, swearing and making threats to injure Mr. Peak. According to this evidence, the men threatened to break in and ''hang'' or ''kill'' appellant. It is certainly a reasonable inference that appellant must have been fearful of injury because, at his request, his wife telephoned the sheriff and asked for help, and, when he refused to act because the house was located within an incorporated town, she telephoned the chief of police, but he refused to come to their assistance. The evidence produced by the prosecution shows that Jane brought a gun to the scene. Appellant testified that

he saw one of the crowd with a gun, and another with an iron bar.

The defense also produced evidence of threats made by Jane against her mother and father, and there was evidence that only a few days before the shooting Jane had choked her mother and threatened to kill her.

There was a direct conflict over whether the appellant and his wife paid rent for the premises. All admit that before appellant and his wife moved to 12 Sycamore Avenue, Jane and Ernest paid them $35 a month to care for their child. The grandparents had cared for the child from his birth. Appellant and his wife testified that the agreement was that if they came to stay at 12 Sycamore Avenue, the $35 per month payment should cease and that the $35 per month for the care of the child should be considered rent. Jane testified she continued to pay her parents $35 a month after they came to live with her, and that they paid no rent. There was no record of such payments kept by Jane.

There was a direct conflict as to whether Jane had paid appellant for his services at the store. Jane testified she first paid him $35 per week, and later $50 per week for such services. Peak denied receiving any payments. Jane testified that she made the payments in cash, and admitted that no record was kept in the store books of such payments. She testified that the reason the transaction was so handled was because if her father was an employee he would have to get a Social Security card, that he had none, and did not want to get one. Appellant, however, produced his Social Security card which he had had for at least two years.

Jane testified that many quarrels occurred between Ernest and her father, and that her father swore at and threatened Ernest on many occasions. Ernest testified that he had never heard appellant swear at him, nor had they quarrelled.

As to the actual shooting, appellant testified that he was fearful that the men intended to harm him and his wife. He testified, and his story is corroborated by his wife and son, and partially by Mrs. Campbell, that he did not get the shotgun until he saw someone in the group outside with a pistol and another one with an iron bar; that the crowd called him vile names and dared him to come out; that they threatened to beat him up, to hang him, and to kill him; that just before the shooting, Willie Epidendio was standing beside the front door pounding on the door; that Willie yelled ''I am going—

you God damned son-of-a-bitch—to kill you''; that with that he kicked in the glass of the lower panel of the door; that a curtain was drawn over the door so that all that could be seen were Willie's legs; that when Willie kicked in the glass, appellant turned the shotgun away from Willie and fired onto the porch; that he did not want to hit Willie and aimed at the porch to scare him; that he did not know Jane and Ernest were then coming up on the porch; that they walked into the line of fire; that he had not intended to hit anyone.

This evidence is not recited for the purpose of indicating that it is stronger evidence than that produced by the prosecution. The credibility of the witnesses was, of course, for the jury. But the above evidence is recited for the purpose of showing that there was substantial evidence in support of the defense, that the case was a very close one on the facts, and that the statement appearing in the majority opinion quoted above is not borne out by the record. Under such circumstances, any substantial error takes on added significance. If error is committed, and if reasonable minds may reasonably differ over whether it is prejudicial, the benefit of the doubt should be accorded the accused, and the case reversed.

There was another serious error committed at the trial in connection with the unreasonable and improper limitation placed by the trial court on the cross-examination of the witness Miller. Miller was one of the group outside the house. The prosecution did not produce him as a witness in presenting its main case. Appellant testified that he saw Miller on the porch with an iron bar in his hand, and that this was one of the reasons he was afraid to let the group into the house. The prosecution thereupon called Miller as a rebuttal witness. He was asked if, on the morning of November 14, 1943, he was at the premises at 12 Sycamore Avenue in Larkspur. He answered that he had been, and in response to another question stated that he had been on the front porch of the premises that day. He then testified that at no time that morning did he have an iron bar or any other kind of weapon in his hand or possession.

On cross-examination he testified that he was on the porch of the house for about fifteen minutes, and then left. He was then asked: ''Tell me everything you did from the time you got there until you left.'' He was not permitted to answer this question, the trial court sustaining an objection that this

was beyond the scope of the direct examination. A like objection was sustained to the questions: "What were you doing? What did you go there for?"

These questions were vital to the defense. The entire defense was predicated on the theory that appellant was fearful of his life, and one of the reasons given was that Miller had come up on the porch with an iron bar in his hand. The prosecution elected on Miller's direct examination to ask him questions that placed the witness on the porch on the day in question. That opened up the question as to everything he did there on that day. Under section 2048 of the Code of Civil Procedure appellant had the right on cross-examination, to examine the witness "as to any facts stated in his direct examination or connected therewith." As was held in *People v. Flores,* 15 Cal.App.2d 385, 401 [59 P.2d 517]: "A full cross-examination is not a matter of privilege; it is a matter of 'absolute right.'" (See, also, Code Civ. Proc., § 1854, and *People v. Teshara,* 141 Cal. 633, 636 [75 P. 338]; *People v. Mammilato,* 168 Cal. 207, 213 [142 P. 58]; *People v. Roach,* 139 Cal.App. 384, 385 [33 P.2d 895].) It certainly was pertinent to inquire about everything Miller did during his stay on the porch, and to ascertain why he had come. It was appellant's word against that of the witness on the vital question as to whether the witness had an iron bar in his hand. Certainly the defense should have been accorded the fullest opportunity to check the witness' activities while on the porch so that the jury could have the opportunity of determining who was telling the truth.

The majority opinion holds that the sustaining of the objection to the first question above quoted was not error for the reason that the "question is rather broad and might call for a lengthy dissertation on irrelevant and immaterial matters." No objection was made to the form of the question. The objection was sustained on the sole ground that it went beyond the scope of the direct examination. Nothing that Miller could have done from his arrival on the porch to his departure therefrom could be irrelevant or immaterial on the vital issue under discussion. As to the sustaining of the objection to the question "What did you go there for?" the majority opinion states "the answer . . . . appears numerous times." If by that statement it is meant to imply that the answer appears "numerous times" in the testimony of Miller, it is a misinterpretation of the record. Miller at no time testi-

fied as to why he had gone to the Peak home that morning. If the statement in the majority opinion means that other witnesses testified that all of the group went to the house to move the furniture, it is a correct statement of the record, but it has no relevancy at all to the point under discussion. Just because several witnesses have testified to their purpose in doing an act, that does not warrant the court in prohibiting an inquiry into the purpose of a witness who is under examination when that purpose is relevant to the issue under discussion. Miller's purpose was of great importance. If he went there to assault appellant, the fact that the others were there to move the furniture would be immaterial. Under the circumstances, the limitation on the cross-examination was unwarranted, was not within any lawful discretion of the trial court, and when considered with the other errors, warrants a reversal.

The trial court, in my opinion, also committed prejudicial error in the instruction quoted on page 1036 of the majority opinion. By that instruction the court told the jury that if they should find that appellant was a licensee, then he had no right "to exclude" Jane and Ernest from the premises, "nor did he have the right to use any force or violence to prevent them, or either of them, from entering said premises together, and *any assault* with a deadly weapon by the defendant upon said Ernest Epidendio and Jane Epidendio, while they, or either of them, were entering or attempting to enter the said premises together, *would not be justified.*" (Italics added.) That is not the law. By that instruction the jury were told that if they found that the Peaks were licensees and not tenants entitled to the exclusive use of the premises, then, under no circumstances could appellant use any force or violence to prevent Jane and Ernest from entering, regardless of how that right was sought to be exercised, and regardless of the purpose of the entry, and that, under such circumstances, *any assault* committed by appellant "would not be justified." The basic issue presented to the jury was whether the shooting, which was admitted, was justified. By this instruction the jury were told that if they found certain facts to be true, then the assult was not justified. Inasmuch as this was the only issue before the jury, there can be no escape from the conclusion that such an instruction amounted to a direction to the jury to find the defendant guilty if they found he was a licensee. The instruction is obviously incomplete in that it disregards completely

the manner in which the right of entry, assuming it to exist, was attempted to be exercised, disregards the purpose of the entry, and completely disregards the entire defense of self-defense. It would have been simple enough to have placed the proper limitations in this instruction so as to present a proper picture of the law to the jury. It is no answer to say that the jury was properly instructed on self-defense. The challenged instruction was given immediately after the instructions on self-defense. As I read the instructions, the one under consideration reads as if it were a limitation on the self-defense instructions. To say the least, the jury may reasonably have believed that self-defense was available only if appellant was a tenant, not if he were a licensee. This error was obviously prejudicial.

In view of these several errors it is my opinion that the judgment and orders appealed from should be reversed, and a new trial ordered.

A petition for a rehearing was denied December 7, 1944. Peters, P. J., voted for a rehearing. Appellant's petition for a hearing by the Supreme Court was denied December 21, 1944. Carter, J., and Schauer, J., voted for a hearing.