[Crim. No. 7975.   Second Dist., Div. One.   June 13, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. JAMES SCOTT CRUMBLEY, Defendant and Appellant.

James Scott Crumbley, in pro. per., and Earl Klein for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Edmond B. Mamer, Deputy Attorney General, for Plaintiff and Respondent.

WOOD, P. J.—In a nonjury trial defendant was adjudged guilty of assault with a deadly weapon, a felony. He appeals from the judgment and the order denying his motion for a new trial.

He contends that the court erred in receiving in evidence the testimony of the victim, Wilburt Bloxham, which was given at the preliminary examination; and that the evidence was insufficient to prove an assault with a deadly weapon.

Mr. Bloxham was not present at the trial. In order to lay a foundation for presenting his testimony which was given at the preliminary examination, the People submitted testimony as follows:

Mr. Dengkin, an employee in the investigation department of the district attorney's office, testified: On June 15, 1961, he received a subpoena which directed certain persons, including Wilburt Bloxham, to appear on June 19 as witnesses in the present case. On June 16 he called Mrs. Bloxham by tele-

phone, and she said: She had not seen Mr. Bloxham for a couple of weeks or more—after he had taken her money and had beaten her; she had made numerous efforts to locate him through friends and neighbors, but she did not know where he could be found—that probably he went to Chicago or Salt Lake City; she did not know "a further address" of any relatives or persons where he might go in Chicago, but she knew he had relatives there. Mr. Dengkin testified further that, in a conversation with Mrs. Bloxham on the morning of the trial, he tried to ascertain whether there were other places where Mr. Bloxham might be located, or to ascertain where he was employed. She replied that she had no further information and had no idea as to his whereabouts—that his place of employment was the apartment house (which she managed) because he managed it for her when she was disabled. About 11:30 a. m. on the day of the trial, he asked his assistant to inquire at hospitals and the police department to see if he could locate Mr. Bloxham. About 11:55 a. m. the assistant reported that he had contacted the General Hospital, the city and county jails, and the coroner's office, and that Mr. Bloxham was not at any of those places.

Mrs. Bloxham testified (with respect to the unavailability of Mr. Bloxham as a witness): She last saw him on Sunday, a week before Memorial Day in 1961. On that day, about 8 a. m., he left the apartment or hotel, where they lived, and said he was going to get a package of cigarettes. She has not heard from him since that day. Several times when he had been drinking he would speak of going to Chicago or Salt Lake City. On several previous occasions he had left their home without telling her where he was going. Sometimes he would stay away three or four months. On some of those occasions he went to Salt Lake City. In an effort to locate him, she made inquiries in the immediate vicinity of their home.

Defendant objected to the preliminary-examination testimony of Mr. Bloxham being used at the trial, on the ground there was not a sufficient showing that due diligence had been exercised in trying to locate him. The objection was overruled.

That testimony of Mr. Bloxham was in substance as follows: On February 27, 1961, when he went into the kitchen of his home (the hotel), the defendant was sitting there, and they "had a word or so." Then he (witness) went into the office of the hotel. He heard a blast in defendant's room in the hotel, which blast sounded like a shotgun that was "going off." Then the defendant came up to the front of the hotel (the

office) and said: "Chuck [meaning the witness], step out in the doorway. I want to see you. I want to talk to you." He (witness) replied: "I am on the telephone." Defendant said: "You're calling the police and I'm going to shoot you." At that time he did shoot, or the gun "went off," through the wall near the place where Bloxham was sitting on a bed. The wall was about 3 feet from Bloxham, and the shot went about 1½ feet from the place where he was sitting. As a result of the shooting, Bloxham had a scratch on his nose and a scratch on his neck. At the time defendant was stating that he was going to shoot, he was not where the witness could see him, but his voice "was coming from outside the office." The shot left a hole in the wall. There was a door about 12 or 18 inches from that hole. Immediately after the shooting, the defendant said: "Mom [meaning Mrs. Bloxham], are you all right?" Mr. and Mrs. Bloxham and Nancy Nelson were in the room when the shot went through the wall.

Mrs. Bloxham testified: That on February 29, 1961, about 3 p. m., while she and Miss Nelson were in the kitchen, the defendant, who lived at the hotel, came there and sat in a chair. Mr. Bloxham, who was drunk, came from the bedroom to the kitchen and said to defendant: "I hear you are going to shoot me. You go back, get your shotgun and bring it up here. I will get my .32 and we will shoot it out." Defendant did not say a word, but he left the kitchen. After that she heard something that sounded as if it were a shot in the building. Soon thereafter someone said: "Chuck, come out. I want to talk to you." Then she heard a shot that was fired into the room. At that time Mr. Bloxham, who was drunk, was sitting on the bed, where he was using the telephone.

Mr. Richardson, who lived at the hotel, testified: That on said day, while he was in his room, he heard a loud noise which sounded like something had dropped on a cement floor. About four minutes later he heard another noise which sounded like a gun shot. He went to the door of his room and saw smoke in the hallway. Then he went out the back door of the hotel and around the building to the front of the hall. From that place he saw the defendant standing in the hallway, leaning against the wall, and holding a shotgun in his right hand. Defendant did not say anything, but he handed the gun to the witness, who then took the defendant to defendant's room, put him on the bed, and put the gun in the closet.

Officer Schroeder testified: That on said day he took a shotgun (Exhibit 9) from the closet of defendant's room. He

took a loaded shotgun shell and an empty shell (Exhibits 10 and 11) from the top of a chest of drawers in the room.

Officer Murphy testified: That on said day he saw an empty shotgun shell (Exhibit 13) which was on the floor of the hotel office. At the police station, on that day, he asked the defendant whether he owned the gun. He did not reply. The officer asked where he got the gun. He replied, ''Windward Avenue.'' The officer asked what occurred at the hotel. He replied that he was having trouble with Chuck who was ''hasseling'' him and had said something derogatory of the police department, that he (defendant) went to his room, got his shotgun and fired it, and then he went down the hallway to the office where Chuck was. The officer asked him whether he fired into the office. Defendant smiled and winked. The officer asked whether the smile and wink meant that he shot through the wall into the office. Then defendant smiled and winked again.

Officer Tetzlaff testified: That at the police station, on said day, he asked defendant what had happened. Defendant said that Chuck was no good, that he beats ''Ma'' (meaning Mrs. Bloxham), that on this evening Chuck was ''hasseling'' defendant and had hit him in the mouth, that defendant went to his room and fired his shotgun, that he then went into the hallway and fired it again. The officer asked whether he shot at Chuck and meant to kill him. Defendant laughed and winked.

Defendant testified: That he did not fire a shotgun, on said February 27 or on any date, in the direction of Chuck or in the hotel. He did not have any conversation with the officers such as the conversations related by them. On said day, he was not standing in the hallway, leaning against the wall and holding a shotgun. Mr. Richardson did not take a gun from him on that day. He (defendant) was asleep in his room and did not learn about a shooting at the hotel until the police had taken him to the police station.

The court did not err in receiving in evidence the testimony of Mr. Bloxham which was given at the preliminary examination. Section 686 of the Penal Code provides that: ''In a criminal action the defendant is entitled: . . . 3. . . . to be confronted with the witnesses against him . . . except that where the charge has been preliminarily examined before a committing magistrate and the . . . defendant . . . has . . . had an opportunity to cross-examine the witness; . . . the deposition of such witness may be read, upon its being satisfactorily shown to the court that he . . . cannot with due

diligence be found within the state . . . ." ▬ ▬ The question as to what constitutes due diligence as referred to in that section "is largely within the discretion of the trial court, and depends upon the facts of each particular case" and the decision of the trial court on that question will not be disturbed on appeal if there is substantial evidence supporting it. (*People* v. *Cavazos*, 25 Cal.2d 198, 200-201 [153 P.2d 177].) ▬ "The phrase 'cannot with due diligence be found within the state' means 'that *some* effort must be made to locate the witness in the state at large unless there is evidence from which the court may properly conclude that such a search would be unavailing.'" (*People* v. *Kuranoff*, 100 Cal.App.2d 673, 676-677 [224 P.2d 402].) ▬ In the present case the trial court could reasonably have concluded from Mrs. Bloxham's testimony that Mr. Bloxham probably had gone out of the state, and that a more extensive search would have been unavailing.

▬ Appellant asserts that the evidence was insufficient to prove an assault with a deadly weapon. He argues to the effect that since he did not enter the room where the victim was, and since the circumstantial evidence indicates that whoever fired the shot was outside the wall and could not aim at any particular person, there was no present ability or intent to injure anyone.

"An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (Pen. Code, § 240.) "Every person who commits an assault upon the person of another with a deadly weapon . . . is punishable by imprisonment in the State prison . . . or in a county jail . . . ." (Pen. Code, § 245.) "The difference between the offenses referred to in sections 240 and 245 [Penal Code] is that in the latter a deadly weapon is involved." (*People* v. *Peak*, 66 Cal.App.2d 894, 900 [153 P.2d 464].) ▬ Whether there was intent to commit a violent injury on the person of another is a question of fact, and such intent may be implied from the act committed. (See *People* v. *Carmen*, 36 Cal.2d 768, 776 [228 P.2d 281].) In *People* v. *Lee Kong*, 95 Cal. 666, 670 [30 P. 800, 28 Am.St.Rep. 165, 17 L.R.A. 626], the defendant fired a shot through a roof intending to shoot a policeman who was on the roof. In affirming a judgment of conviction of assault with intent to commit murder, the court said: "Appellant's mistake as to the policeman's exact location upon the roof accords no excuse for his act, and causes the act to be no less an assault. These acts disclose an assault

to murder as fully as though a person should fire into a house with the intention of killing the occupant, who fortunately escaped the range of the bullet. [Citation.] The fact that the shots were directed indiscriminately into the house rather than that the intended murderer calculated that the occupant was located at a particular spot, and then trained his fire to that point, could not affect the question. The assault would be complete and entire in either case. . . ." █ In the present case the evidence was sufficient to prove present ability and intent to commit an assault with a deadly weapon, and was sufficient to identify defendant as the person who committed the assault.

The judgment and the order denying the motion for a new trial are affirmed.

Fourt, J., and Lillie, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 8, 1962.