[Crim. No. 2753. In Bank.—September 30, 1925.]

## THE PEOPLE, Respondent, v. HARRY GARBUTT, Appellant.

[1] CRIMINAL LAW—MURDER—EXCLUSION OF WITNESSES FROM COURT-ROOM—DISCRETION OF TRIAL COURT.—In this prosecution for murder, in view of the fact that, as to the two principal witnesses, who were the only witnesses present in the house at the time of the homicide, the trial court excluded each from the courtroom when the other was testifying, considered in connection with the absence of accommodations elsewhere for the witnesses, it could not be said that the trial court did not exercise a sound discretion in refusing to grant defendant's motion at the beginning

1. See 8 Cal. Jur. 224.

of the trial to exclude all witnesses in the case other than the particular witness under examination.

[2] ID.—LEADING QUESTIONS—DISCRETION OF TRIAL COURT—APPEAL.— The motives for the action of the trial court in permitting leading questions to be asked are often of the character that the printed record on appeal but poorly discloses, and for this reason alone a *wide range is given it in governing the conduct of attorneys* in the examination of witnesses; and it is only in very exceptional cases that the appellate court will declare the trial court to have abused its discretion in matters of this kind.

[3] ID.—CHARACTERIZATION OF KILLING AS "MURDER"—MISCONDUCT OF DISTRICT ATTORNEY—INSTRUCTIONS.—In a prosecution for murder, the killing should not be characterized as "murder" in advance of the verdict so finding, but the action of the district attorney in asking a witness if a certain event was "after the murder" will not be held to constitute reversible error where, upon an assignment of misconduct being made by counsel for defendant, the court immediately instructs the jury that the "question relates to time and is not an effort to introduce evidence which will prove—which will determine whether or not murder was committed," and it does not appear that the jury was influenced thereby.

[4] ID.—CORRECTNESS OF TRANSCRIPT—STATEMENTS OF DISTRICT ATTORNEY—REBUTTAL EXAMINATION.—In a prosecution for murder, prejudicial misconduct may not be predicated upon the statement of the district attorney that the transcript of the testimony of a certain child before the grand jury contains "considerable clerical errors," which statement is made when defendant's counsel is seeking to have said child read her grand jury testimony before testifying to it, where the jury is immediately admonished that the statement of the district attorney is not evidence and is not offered as evidence, and the child is fully interrogated as to such testimony and it does not appear that any injury resulted; nor is any harm done by repeating in rebuttal a question put to such child and answered on her examination in chief, notwithstanding it is clearly not proper rebuttal.

[5] ID.—IMPROPER CROSS-EXAMINATION—REASONABLE CONTROL BY TRIAL COURT.—In this prosecution for murder, there was no merit in the contention that the trial court erred in sustaining objections of the district attorney to evidence brought out by the defendant, on cross-examination, and refusing to admit such evidence and testimony, where many of the questions were improper and the trial court exercised a reasonable control over the entire examination.

[6] ID.—ROBBERY AS MOTIVE—EVIDENCE—INSTRUCTIONS.—In this prosecution for murder, in which the theory of the prosecution

was that the motive for the homicide was robbery, an instruction on robbery found some support in the record, even though there was no direct evidence that a robbery was committed or actually attempted.

(1) 16 C. J., p. 841, n. 1, 3.    (2) 17 C. J., p. 245, n. 70; 40 Cyc., p. 2427, n. 26, 28, p. 2429, n. 30.    (3) 16 C. J., p. 892, n. 99, p. 917, n. 67.    (4) 16 C. J., p. 917, n. 67.    (5) 17 C. J., p. 245, n. 71.    (6) 30 C. J., p. 295, n. 15, p. 349, n. 8.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Charles S. Crail, Judge. Affirmed.

The facts are stated in the opinion of the court.

Kenneth K. Scott and Moses C. Davis for Appellant.

U. S. Webb, Attorney-General, and · John W. Maltman and John L. Flynn, Deputy Attorney-Generals, for Respondent.

LAWLOR, Acting C. J.—An indictment returned by the grand jury for the county of Los Angeles and filed September 25, 1924, charged the defendant with the murder of Mrs. Dorothy Lee Hunn in the city of Pasadena. He was tried upon the charge and found guilty of murder in the first degree, the verdict calling for the death penalty. Subsequently a motion for a new trial was interposed on behalf of defendant and denied. The appeal is by the defendant from the judgment of conviction and from the order denying his said motion for a new trial.

We will first outline a portion of the evidence leading up to and connected with the homicide. The appellant came to California from an eastern state in December, 1923. Upon his arrival he took up his abode with his aunt in Los Angeles—a Mrs. Fannie Moorhouse—and remained there for some time. During his residence in Los Angeles he was known under the *alias* name of Harry Connors, it appearing that he had recently been released from Joliet penitentiary after serving a term for burglary. Shortly after Christmas, 1923, appellant met the deceased at his aunt's residence. According to the evidence he had called at the deceased's residence several times before his final visit on

September 19, 1924, when she met her death. She was a married woman who had reached middle age and resided at 90 North Madison Avenue, Pasadena, with an adopted daughter, Virginia Lee Hunn, who was ten years of age. The husband of the deceased resided in Chicago. She had some means and owned considerable jewelry which she frequently, if not habitually, carried upon her person.

It was about 4:30 o'clock in the afternoon of September 19, 1924, when appellant called at the residence of the deceased. He was admitted by one Frederick R. Gibson, who was known as a cousin of the deceased and who seems to have spent considerable time in her company. As the dinner hour approached appellant was invited by the hostess to remain to dine. He accepted the invitation. In the meantime the child Virginia came into the house. The party, consisting of the deceased, the child, Frederick R. Gibson, and the appellant, sat down to dinner shortly after 6 o'clock. At the completion of the meal the child was taken by the deceased to her room and put to bed. This was about 7 o'clock. From this point there is a divergence in the testimony as to the succeeding events. Gibson relates that he retired to the bathroom, leaving appellant and the deceased, who had returned after putting the child in bed, in the kitchen alone; that he was in the bathroom a very brief period when he heard a scuffle or commotion in the kitchen; that he left the bathroom and was unable to gain entrance to the kitchen, as the door leading thereto was either locked or held by someone on the opposite side; that he then went to a neighbor's house to secure aid and while returning to the residence he noticed appellant going down the other side of the street; that he (Gibson) and the neighbor, whose assistance he had enlisted, found the body of the deceased lying in a small runway or court to the rear of the residence; that they carried the body into the house; that they observed wounds on her head and a bullet wound in her chest, from all of which the blood was issuing profusely, and that medical and police aid was summoned and the deceased pronounced dead. This version of Frederick R. Gibson is corroborated in certain particulars by the child who, as she testified, had witnessed some of the actions of appellant and Gibson from her room where she was lying

in bed. The similarity in the testimony of Gibson and the child will later appear.

Appellant, on the other hand, after his arrest, gave a version at variance in important particulars with that given by Gibson as well as the child. He stated, in substance, that when the deceased went with the child to the latter's room he arose, retired from the kitchen and went to the bathroom just as the deceased returned to the kitchen; that Gibson and the deceased were alone there; that while in the bathroom he heard a scuffling in the kitchen; that he returned thereto and as he entered found Gibson striking the deceased on the head and face with an instrument of some sort; that he intervened to stop the attack upon the deceased; that Gibson thereupon raised the hand with which he was holding the weapon of attack; that he (appellant) warded off the blow with one hand, reached into his inside coat pocket, pulled out a gun and pressed it against Gibson; that the latter shoved or struck the hand holding the gun, causing it to discharge; that Gibson then fled from the house and he (appellant) not knowing that the bullet had struck the deceased, followed in pursuit of Gibson, but that when he reached the street Gibson was not in sight; that he then realized he was in a bad predicament because he was an "ex-con"; that he therefore walked down the other side of the street and away from the scene; that after he had gone some distance he telephoned for a taxicab and drove to the Rosslyn Hotel in Los Angeles, which he entered by the main entrance and left by a side exit without paying his cab fare; that he then repaired to the Hayward Hotel, where he was living with one Irene Kirkoff; that he changed his clothes, whereupon he and the woman left, and that they stayed at the Earl Hotel that night. His subsequent movements are sufficiently set forth in the summary of the testimony later appearing.

### I.

It is claimed by appellant that the shooting of the deceased was accidental and for which he was in no way legally responsible. But it is not contended that the evidence was insufficient as matter of law to support the verdict of a felonious killing; indeed it is conceded that "The statement set forth by the attorney general is very fair and to the point . . . " wherein, among other things, the attorney-

general asserted that "The appellant, on this appeal has not questioned the sufficiency of the evidence. . . . "

II.

[1] It is contended by the appellant that "The court committed error prejudicial to the substantial rights of . . . the appellant herein, to a fair and impartial trial guaranteed him under the Constitution and laws of the state, . . . especially in refusing to grant the motion of the defendant at the beginning of the trial to exclude all witnesses in the case from the courtroom, so as to prevent the persons so excluded from hearing the testimony of witnesses under examination, and in enforcing the exclusion only as to one witness, viz., Virginia Lee Hunn, during the examination of Frederick R. Gibson. . . .

"Applying the doctrine as laid down by Mr. Wigmore, this Honorable Court will see by reading the evidence given by: Clifford R. Hunn, Frederick R. Gibson, Franklin W. Latham, Mrs. F. W. Latham, Miss Marceline Keiser, Mrs. Georgia Keiser, Virginia Lee Hunn, Irene Kirkoff, Robert E. O'Rourke and Mrs. Lucretia Kemper, that all of these witnesses testified more or less to the occurrences immediately before and after the death of Dorothy Lee Hunn. And counsel state that effective cross-examination of Mr. and Mrs. Latham, Miss and Mrs. Keiser and Mrs. Lucretia Kemper was prevented by their being present and hearing the testimony of the witnesses Frederick R. Gibson and Virginia Lee Hunn. Miss Keiser and Mrs. Keiser testified as to Mr. Gibson's actions following the noises which they claimed to have heard in the Hunn house. Mr. and Mrs. Latham testified as to Mr. Gibson's actions immediately after he left the Hunn house and after he got in touch with the Lathams. . . .

"All of these facts were known to the district attorney before the trial came up, but they were not, and could not, be known to the defendant, as many of these witnesses did not testify before the grand jury; so that the apparent frankness of the district attorney was very misleading and most prejudicial to the defendant. . . . "

The following statement of the attorney-general is supported by the record: "An examination of the record will show that the most vital testimony introduced by the prosecution, was that of Virginia Lee Hunn and F. R. Gibson,

the two persons present in the house at the time of the homicide. As to these two witnesses the court did exercise its discretion in excluding one from the courtroom while the other was testifying."

Appellant moved for the exclusion of the witnesses before any of them was examined. We quote from the record:

"Mr. Scott: At this time, if the Court please, we desire to invoke the rule for the exclusion of witnesses.

"Mr. Dennison: Well, I don't know of any rule; it is a discretionary matter addressed to the Court and, of course, it is proper to do it when it is convenient for the witnesses. In our courtroom the only convenience we have for the witnesses is out of the courtroom. In preliminary hearings that is arbitrary, but the rest is directed to the sound discretion of the Court and exercised wherever there is provision made for witnesses. We haven't any special room for them.

"Mr. Davis: Due to the importance of this case, we want a fair and impartial trial, we move the rule be invoked and the witnesses be excluded from the courtroom during the testimony of the witness on the stand.

"The Court: Well, I would be willing to do that for those witnesses whom you claim will testify to the same transaction, but not as to the others.

"Mr. Scott: As we understand it, we think we would be entitled to it for all the witnesses, that the Court would exclude all witnesses, under the rule.

"The Court: I don't understand that you have a right to exclude the witnesses as an arbitrary matter.

"Mr. Scott: It is a matter of the sound discretion of the Court.

"The Court: As I say, I would be glad to exclude those witnesses, where there are two or more who testify regarding the same transaction, the same conversation."

Section 2043 of the Code of Civil Procedure provides in part: "If either party requires it, the judge may exclude from the courtroom any witness of the adverse party not at the time under examination, so that he may not hear the testimony of other witnesses; . . . "

It was held in *People* v. *Ong Git*, 23 Cal. App. 148, 152 [137 Pac. 283, 285], cited by the respondent, involving a charge of murder: "The exclusion of a witness, however,

is not a matter of absolute right in every case. A request for such exclusion is addressed to the discretion of the trial judge, the exercise of which must be controlled largely by the circumstances of the individual case. (*People* v. *Garnett,* 29 Cal. 622; *People* v. *Sam Lung,* 70 Cal. 515 [111 Pac. 673].)'' For a further statement of the rule see *People* v. *McCarty,* 117 Cal. 65 [48 Pac. 984]; *People* v. *Nunley,* 142 Cal. 441 [76 Pac. 45]; *People* v. *Gasser,* 34 Cal. App. 541 [168 Pac. 157]. That this is a matter within the discretion of the trial court is thus conceded by the appellant: ''And we agree with the conclusion that the exclusion of witnesses is within the sound discretion of the court.''

It cannot be held, in view of the fact that the court excluded the child and Frederick R. Gibson, the two principal witnesses, when the other was testifying, considered in connection with the absence of accommodations elsewhere for the witnesses, that the court did not exercise a sound discretion in the premises.

Nor do we perceive any ground for the asserted misconduct on the part of the district attorney in connection with this motion.

[2] The appellant next contends that ''As a further evidence that the district attorney misconducted himself so as to prevent a fair trial of the case, the court erred in allowing the district attorney to lead witnesses, notwithstanding the repeated objections of defendant's counsel.'' Many excerpts from the transcript are included in the brief to illustrate the occasions upon which it is claimed that the district attorney, over appellant's objections, misconducted himself by leading the witnesses.

In answer to appellant's contention the attorney-general argues that ''It is a well-recognized rule that leading questions are within the discretion of the trial court,'' citing section 2046 of the Code of Civil Procedure, *People* v. *Nunley,* 142 Cal. 441, 445 [76 Pac. 45], *People* v. *Brown,* 130 Cal. 591, 593 [62 Pac. 1072], *People* v. *Bannon,* 59 Cal. App. 50, 59 [209 Pac. 1029], and *People* v. *Hinrich,* 53 Cal. App. 186 [199 Pac. 1058], adding, ''Though we have briefly answered counsel under this assignment of error we are mindful that the requisite affirmative showing of such an error does not appear.''

It is declared in *People* v. *Nunley, supra*: "Two questions asked by the prosecution were objected to as leading. If it be conceded that they were leading, the answer is, that this is a matter within the discretion of the trial court, and no abuse of that discretion is apparent." And what is said in the following excerpt from *People* v. *Brown, supra,* may be regarded as an answer to the contention here: "At the same time, it is only in very exceptional cases that we will declare the trial court to have abused its discretion in allowing an attorney to ask leading questions. The motives for the action of the trial court in matters of this kind are often of the character that the printed record brought before us but poorly discloses, and for this reason alone a wide range is given it in governing the conduct of attorneys in the examination of witnesses."

[3] As an additional assignment of misconduct upon the part of the district attorney exception is taken to this question put to a witness: "Q. Was that after the murder?" It is contended by appellant that "If the defendant had no further objections to urge, counsel feel that the above statements alone would be sufficient ground for reversal of the case, as it shows such malicious misconduct on the part of the district attorney, and we feel sure that the ruling of the court on page 61, line 4: 'The Court: The jury will understand that question relates to time and is not an effort to introduce evidence which will prove—which will determine whether or not murder was committed, that particular question,' was not sufficient to cure the prejudice thus put into the minds of the jury. The impression of *'murder'* placed in the minds of the jury by the statements and the conduct of the district attorney, and especially by the manner in which he brought out the word *'murder,'* was very prejudicial to the defendant, for up to this time there had been *no conviction of murder;* and such an impression should not have been made upon the minds of the jury."

In reply the attorney-general cites *People* v. *Daily*, 135 Cal. 104, 106 [67 Pac. 16] and claims that "A reading of the two preceding questions shows that the district attorney was attempting to elicit from the witness the time when he first saw the hammer with relation to the homicide. It is to be further noted that upon objection to such use of the word the court instructed the jury"—then follows the in-

struction above quoted. It is true, of course, that the killing should not have been characterized as "murder" in advance of a verdict so finding. But we do not think, in view of the connection in which the word was used by the district attorney, and the admonitory instruction promptly given by the court, that the jury was influenced thereby.

[4] Again it is insisted by the appellant that "The district attorney further misconducted himself in testifying as to the correctness or incorrectness of the statements made by the witness, Virginia Lee Hunn, as transcribed by the grand jury reporter and set forth in the Reporter's Transcript of the proceedings before the grand jury." Under this contention there is set forth a statement by the district attorney objecting to the action of appellant's counsel in seeking to have the child read her grand jury testimony before testifying to it upon the ground that the transcript thereof contained "considerable clerical errors." In other words, that counsel for appellant should show the transcript to be correct before eliciting the testimony.

The incident is assigned as prejudicial error. If the district attorney intended to clear the transcript of the asserted errors, a better course perhaps was either to have called attention to the discrepancies as they were reached in the presentation of the testimony or developed them on cross-examination. The point to the contention is that so characterizing the transcript was calculated to weaken in the minds of the jury the testimony sought to be elicited. But here, too, the court admonished the jury, evidently to avoid any possible prejudice, as follows: "I am sure the jurors all understood that what Mr. Dennison said was not evidence and not offered as evidence, but merely as an explanation on his part in replying to the remarks made by Mr. Davis, after you had heard what Mr. Dennison had to say, or words to that effect. The jury understands that it is not evidence. You are now instructed it is not evidence, what Mr. Dennison said, but was merely a statement, of course. The motion is overruled."

Moreover, as was said in *People* v. *Putman*, 129 Cal. 258, 262 [61 Pac. 961, 962], "Counsel's conduct must reach a course of proceedings militating against justice and the fair and orderly conduct which should characterize a judicial proceeding in criminal cases before error can be predi-

197 Cal.—14

cated on it. (*People* v. *Ward,* 105 Cal. 340 [38 Pac. 945];
*People* v. *Wong Chuey,* 117 Cal. 630 [49 Pac. 833].)'' See,
also, *People* v. *Smith,* 143 Cal. 597 [77 Pac. 449]: And it
is to be kept in view that the child was fully interrogated
as to such testimony and it does not appear that any injury
resulted. Nor do we think any harm was done by repeating
in rebuttal a question put to the child and answered on her
examination in chief, notwithstanding it was clearly not
proper rebuttal.

### III.

It is next contended that ''The court erred in overruling
certain objections of the defendant, made at the time of the
trial, to the admission of evidence taken and received at
the trial.'' Several pages of the transcript are then quoted
which it is unnecessary to set forth here. We have ex-
amined the rulings complained of and do not find any
prejudicial error in any of them.

### IV.

[5] Hereunder it is urged that ''The court erred in sus-
taining objections of the district attorney to evidence
brought out by the defendant, on cross-examination and re-
fusing to admit such evidence and testimony.'' It is ap-
parent from the record that many of the questions were
improper and in our opinion the court exercised a reason-
able control over the entire examination. (Sec. 2044, Code
Civ. Proc.)

### V.

[6] In conclusion it is urged that ''Defendant's counsel
are of the opinion that the court misinstructed the jury in
matters of law in giving them any instruction as to rob-
bery. As an abstract proposition of law, the instruction
may be right, but in this case there is no evidence to warrant
the court in instructing the jury that the killing occurred
in the perpetration, or an attempt to perpetrate, the crime
of robbery.

''Of course, the district attorney advanced the theory, or
in other words, created an atmosphere, that there was a
motive for the crime; but there was no evidence in this case
to show that Harry Garbutt had any motive for committing
this act. There were innuendoes and insinuations, and there
was some talk about diamonds and money disappearing; but
there was no evidence at any time to show that Harry Gar-

butt took any diamonds or money from Dorothy Lee Hunn,
or from any person in the Hunn house.''

The theory of the prosecution was that the motive for the
homicide was robbery; and though it may be conceded there
is no direct evidence that a robbery was committed or ac-
tually attempted, nevertheless an instruction on robbery
finds support in the record.   For instance, there is evidence
from which it might be inferred that, notwithstanding ap-
pellant's claim concerning the possession and disappearance
of the $285, he was without funds the day of the homicide;
and that his sudden departure from the bungalow was due
in part to the apprehension that Frederick R. Gibson might
return at any moment and find some of deceased's jewelry
or other property on him; furthermore, he did not pay the
cab driver who drove him to the Rosslyn Hotel, nor his bill
at the Hayward Hotel before he and Irene Kirkoff left there.

In addition to what we have said concerning the asserted
errors it will be seen that in any event no prejudice could
have resulted, as the following condensed statement of the
evidence surrounding the killing abundantly shows:

Frederick R. Gibson testified that after having eaten
dinner he repaired to the bathroom, where he remained
from three to five minutes, leaving the deceased and appellant
alone in the kitchen; that the child had previously been put
to bed; that while he was in the bathroom he heard ''A
great commotion, moving of chairs and so forth''; that he
heard a shot and an outcry; that he went to the kitchen
door but could not open it as it was ''being held''; that he
then went out the front door looking for help; that he went
to the bungalow of a neighbor named Latham; that he and
Latham went back and found the body of deceased in the
runway and brought it into the house; that the police were
summoned; that he could not see appellant when he heard
the ''commotion'' and attempted to return to the kitchen;
that he next saw him walking down the other side of Madi-
son Avenue and away from the residence of the deceased;
that deceased had always worn and kept considerable
jewelry about the house.   On cross-examination he stated
that he thought he saw a hammer on the floor.

C. D. Boaz, a hardware merchant, testified that on Sep-
tember 19, 1924, appellant purchased a hammer from him
similar to the one exhibited by the district attorney and

which was found in the home of the deceased after her death; that he thought he wrapped it in a newspaper; that a copy of the "Southwestern Retailer," of which he was a subscriber, which was shown to him as having been found in deceased's residence, was similar to the paper in which he wrapped the hammer.

Warren Olds, a taxi driver, testified that on September 19, 1924, he answered a call at the "Ice Company" about 8 o'clock in the evening of that day; that the passenger he picked up was appellant; that he took him to the Rosslyn Hotel; and that appellant entered the hotel without paying the fare and did not return.

Franklin W. Latham testified that he owned the property at number 90 North Madison Avenue; that deceased was a tenant of his; that he saw Gibson shortly after 7 o'clock on the evening of September 19, 1924; that upon being called by his wife he went with Gibson to the residence of deceased and found her body lying in a passageway close to her kitchen door; that there was blood on her head and face; that he and Gibson picked her up and took her into the living-room; that he then attempted to restore her, thinking she had fainted; that a doctor was summoned; that in loosening deceased's clothing he noticed a bullet hole in her chest; that on examining the kitchen he found blood spots on the floor and on the refrigerator door; that the hammer exhibited to him he saw for the first time when the child handed it to him as he was stooping over the body of the deceased; that he picked up a piece of paper, similar to that shown him, and gave it to one of the officers; that deceased usually wore considerable jewelry, even at the time of her death. The witness' testimony was corroborated by that of his wife.

Marceline Keiser testified that she lived with her mother in a bungalow adjoining the Hunn residence; that they were home on the evening of September 19, 1924; that she heard a commotion in the kitchen of deceased's house; that she, her mother, and grandmother went out to their front porch; that Gibson rushed across their lawn and inquired if they had a man in the house; that he then ran to Latham's residence; that her mother went toward the passageway where the deceased was found lying; and that she went to the front door and was admitted by the child.

Georgia Keiser, mother of the preceding witness, gave corroborative testimony.

Dr. Frederick A. Bonthius testified that having been summoned he went to the Hunn residence; that the deceased was dead when he arrived; that he found two scalp wounds; also a bullet hole in her chest; that, in his opinion, the deceased died from the bullet wound.

Fanny E. Moorhouse testified she was the aunt of appellant; that she introduced appellant to the deceased shortly after Christmas, 1923; that in a conversation he remarked to her that some "crook" would get the deceased's diamonds, because she "displayed" them so much.

Virginia Lee Hunn testified that on September 19, 1924, she came into the house about 6 o'clock in the evening and there were present at the time " Uncle Frederick and mother and Mr. Garbutt"; that the four dined together; that she went to her room about 7 o'clock to retire; that the deceased accompanied her and later returned to the kitchen; that while she (Virginia) was in bed she saw Gibson go to the bathroom; that she then "heard a bang and a lot of noise out in the kitchen, and I was kind of scared"; that Gibson went from the bathroom toward the dining-room; that he came back and went out the front door; that two or three seconds later appellant went to the davenport in the living-room, picked up his cap and "ran out the front door"; that she picked up a hammer, partly wrapped, in the kitchen; that she tore the paper off; and that appellant did not go into the bathroom that night.

Paul Ging testified that he was employed at the Baltimore Hotel; that appellant had been a guest of the hotel and he had met him there; that on a Friday evening, he could not give the exact date, between 10 and 10:30 o'clock, appellant came to where he was working and borrowed three dollars from him, leaving an automatic gun as security; that he later turned the gun over to the police and recognized it as the gun shown to him in court.

Irene Kirkoff testified that she and appellant had been living together at the Hayward Hotel; that he came into the room, where she was reading in bed, after 7 o'clock in the evening of September 19, 1924, and told her to dress and pack as they were leaving because he was unable to pay the hotel bill; that before leaving he changed his suit; that a gun shown to her was similar to one possessed by the appel-

lant; that after leaving the Hayward Hotel they went to the Earl Hotel and remained there Saturday night; that Saturday morning appellant sent her for a newspaper; that on the following night they stopped "at the hotel on Sixth or Seventh Street"; that they returned to the Earl Hotel on Monday night; and that appellant was arrested on Tuesday; that on Sunday, preceding his arrest, he directed her to leave the state.

Leon Scheuhl, a detective sergeant, testified that he wrote and transcribed shorthand correctly; that after the arrest of appellant, in the presence of other officers and the district attorney, appellant freely, voluntarily, and without duress or pressure, made a statement which the witness took down in shorthand and transcribed; the witness then read the statement to the jury in which appellant referred to the dinner at the deceased's residence on the evening of her death; stated that he went to the bathroom and while there heard a commotion in the kitchen; that he returned to the kitchen and found Gibson beating the deceased about the head with some instrument; that he interfered to stop the trouble; that he reached for a gun in his pocket; that Gibson grabbed his hand, causing the gun to discharge; that he was not aware the bullet struck the deceased; that Gibson fled; that he followed after him to the street but he was lost to view; that being an "ex con" he became "panicky," and for that reason walked rapidly away from the scene of the scuffle; that he called a cab; that he rode to the Rosslyn Hotel; that he entered the hotel without paying his fare and left by a side exit; that he repaired to the Hayward Hotel, changed his suit, and went to the Earl Hotel for the night. The statement went on to detail his other movements up to the time of his arrest. A "joint" statement of Gibson and appellant, made at the deceased's residence in the presence of each other and the police officers, was read, in which each related the highly contradictory versions already set forth.

Robert E. O'Rourke, a police officer, testified that he arrested appellant on September 23, 1924, as he emerged from a rooming-house; that upon his arrest he gave the name of "Hanson"; that on the way down the street he stated, "Well, I am Harry Connors"; that he found a couple of pawn tickets in a bill folder in the possession of appellant; that in another conversation appellant said that on the evening of the homicide in pulling the gun out of his pocket

he lost $285; that this sum had been "slipped" to him by the deceased the day of the homicide because he delivered to her a small package of diamonds which he received from a "fellow" in San Diego.

The appellant, appearing as a witness on his own behalf, told a story substantially in accord with the "statement" read into the record by Officer Scheuhl. He admitted that the statement, as read, was "substantially true" and that there was nothing in it he desired to "correct"; that from the time he arrived in California until the death of the deceased he had not been employed; that the story he told Officer O'Rourke concerning the $285 was false and that, in fact, he had received the $285 from a "bootlegger," with whom he had "invested" $300; and that he told this falsehood to protect the "bootlegger."

It is apparent from the evidence that the jury must have discarded appellant's account of the murder, and in view of our disposition of the asserted errors there is no merit in the appeal.

The judgment and order appealed from are hereby affirmed.

Richards, J., Waste, J., Shenk, J., Seawell, J., Lennon, J., and Houser, J., *pro tem.*, concurred.

Rehearing denied.