Filed 9/8/20  P. v. Patterson CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>AYODELE PATTERSON,<br><br>　　　Defendant and Appellant. | A156047<br><br>(Alameda County Super. Ct. No. H56262 ) |

After a jury trial, appellant Ayodele Patterson was found guilty of the first degree murder of 80-year-old Carolyn June Pavon, who was killed in her home during the commission of a burglary.  On appeal, Patterson contends that the trial court erred in refusing to declare a mistrial and directing the jury to continue deliberations after the jury twice declared it had reached an impasse.  Patterson also alleges that the prosecutor committed prejudicial misconduct by presenting the victim in a sympathetic light and repeatedly using the term "murder" during questioning.  Finally, he argues that the trial court improperly imposed various fines, fees, and other exactions at sentencing without determining his ability to pay.  We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Carolyn June Pavon lived with her dog in the family home in Hayward.  Her husband, a firefighter, had died in 2002, and her two daughters, M.L.

1

and M.G., were grown.  Both children spoke with their mother every few days and saw her about once per week.  M.G. and her granddaughter visited Ms. Pavon on Thursday, June 24, 2010, to discuss a planned family vacation to Disneyland.  M.L. spoke with Ms. Pavon by telephone on Friday evening, June 25, and M.G. had a phone conversation with her mother in the late afternoon on Saturday, June 26.  On Sundays, Ms. Pavon regularly went to dinner at M.L.'s home.  On Sunday, June 27, 2010, when Ms. Pavon did not arrive for dinner and was not answering her telephone, M.L. and her husband drove to Ms. Pavon's house.

When they arrived, they saw the morning newspaper in the driveway, which was unusual as Ms. Pavon had a habit of going out with the dog every morning to get the paper.  Inside, they found Ms. Pavon in her "usual spot" on the living room couch.  She did not appear to be alive.  The house had been ransacked, with the bedcovers pulled back, dresser drawers open, and items strewn about the floor.  A jewelry box was open on the bedroom floor, and several missing drawers were abandoned in the living room.

Ms. Pavon, who was five feet one inch tall and weighed 103 pounds, suffered two gunshot wounds to the chest and two close-up wounds (from within inches) to her face.  One shot to the heart and one to the face were deemed lethal.  Ms. Pavon was shot while reading.  A book with two bullet holes through it was found near her hand, and pieces of pages from a book were found on her pajamas.  No relevant fingerprints were found at the scene of the crime, but two shell casings were recovered from the couch area.  The parties stipulated that the two casings had been cycled through the same firearm or fed through the same magazine.  It was also stipulated that an individual named Donnie Howard pawned a piece of scrap gold jewelry in Oakland on the day Ms. Pavon's body was found.

In September 2014, an amended information was filed by the Alameda County District Attorney, charging Patterson, Howard, and a third individual named Lionel Harris with Pavon's murder. (Pen. Code,[1] § 187.) The information alleged that Patterson was a minor of at least 16 years of age at the time of the murder (Welf. & Inst. Code, § 707, subd. (b)); that he personally and intentionally discharged a firearm and caused great bodily injury and death (§§ 12022.7, 12022.53, subds. (c) & (d)); and that he personally used a firearm (§§ 12022.5, subd. (a), 12022.53, subds. (b) & (g)). The information further alleged the special circumstance of murder in the commission of a burglary. (§ 190.2, subd. (a)(17)(G).)

In September 2015, Harris accepted a plea deal in which he pleaded no contest to felony voluntary manslaughter (§ 192, subd. (a)) and admitted an arming allegation (§ 12022, subd. (a)(1)), in exchange for his testimony. Harris stated he was "blessed" to get a plea deal which carried a 12-year prison term rather than the potential for life without the possibility of parole. Patterson's trial commenced in July 2016, with Harris as the primary witness against him.[2] According to Harris, he and Patterson were close friends and had committed a burglary together prior to Ms. Pavon's murder. Patterson lived a few blocks from Ms. Pavon's residence. Harris had known Howard for about a year prior to the murder and was aware Howard was staying near Patterson.

Harris testified that, on the Saturday of the murder, he was hanging out, drinking, and smoking at Patterson's house when Patterson asked him to

---

[1] All statutory references are to the Penal Code unless otherwise specified.

[2] A previous jury trial, in which Patterson and Howard were tried jointly, ended in a mistrial as to Patterson in November 2015. Howard was convicted and sentenced to life without the possibility of parole.

come along for a "house lick," slang for a burglary. The two met Howard and then walked up a trail to Ms. Pavon's home. While walking, Harris saw that Patterson had a gun underneath his clothes, but did not see Howard with a gun. Harris claimed he would not have participated if he knew a gun was involved. The three men put on gloves to avoid leaving fingerprints. Patterson mentioned there was an older dog on the premises.

According to Harris, after arriving at the house, he went through to the backyard where it was dark. He looked through a window and saw Ms. Pavon walk into the kitchen to get a glass of water, which surprised him. It did not appear that Ms. Pavon had seen him. Harris went to warn the others about Ms. Pavon's presence. He found Patterson in the house. After peeking into the living room and seeing Ms. Pavon with a book, he told Patterson they should wait. Patterson replied: "Fuck that, we about to do this. . . , I'm about to lay her down." Patterson then took his gun, walked into the living room, said, "Give it up lady," and fired four times. The two final shots were to Ms. Pavon's face. Harris yelled: "What the fuck did you do that shit for?" Patterson then started picking up shells and asked Harris to help him. Harris replied that Patterson was crazy and left.[3]

The prosecution offered several prior statements by Patterson to show a consciousness of guilt, corroborating Harris's description of the events. In April 2014, Patterson and Howard were placed in an interview room together where their conversation was recorded. Patterson initially denied involvement with the crime several times, finally declaring it was "a wrap" for both of them and that they were both "fittin' to be gone for a long time for somethin' that we both didn't do, bro." Howard replied: "Somethin' I didn't

_____

[3] Various facts and prior inconsistent statements were introduced at trial to impeach Harris.

do, blood. You know what you did, blood. Go on and take that . . . ." Patterson replied: "Cause we fucked with it tuff? It's cool. It's cool bro. I love ya, bro, it's good. It's over. I don't see how the fuck that's even—I don't see how the fuck that even, bro, I didn't say nothin' about nothin' bro. I don't see how that's hard to keep your fuckin' mouth shut. I don't understand."

On another occasion, Patterson spoke to his mother and girlfriend, C.N., by telephone from jail. While Patterson's mother repeatedly counseled him to say nothing, Patterson was recorded telling Harris—who was in a nearby cell—to "just keep your mouth shut." Later, when C.N. joined the call, Patterson told her that he was going to be incarcerated for "some years." The following exchange then took place:

> C.N.: "[B]ut then again you know . . . you know what you did, like . . . I mean . . . ."
>
> Patterson: "[S]hit, I know what I used to do . . . ."
>
> C.N.: "You always say karma is a bitch."
>
> Patterson: "For sure. [¶] . . . [¶] I'm gon' try and figure something out. [¶] . . . [¶] Ain't shit I can do about it."

In March 2015, an evidence technician at the jail intercepted a letter to Patterson's parents with Patterson's personal identification number in the return address. The writer indicated it would "help me real big" if the parents told defense counsel that the writer was "home on punishment from May 2010 until August 2010," the timeframe of the Pavon murder.

On September 1, 2016, the jury found Patterson guilty of first degree murder and found the burglary special circumstances true. The jury also found true the lesser firearm enhancement—that Patterson personally used a firearm within the meaning of section 12022.53, subdivision (b). However, the jury concluded that Patterson did not personally discharge a firearm

(§§ 12022.7, subd. (a), 12022.53, subds. (c) & (d)) or personally inflict great bodily injury (§ 12022.7).

On November 16, 2018, the trial court sentenced Patterson to life in prison without the possibility of parole. The court additionally imposed restitution obligations and various fine, fees, and assessments as discussed further below. Patterson's timely notice of appeal followed.

## DISCUSSION

### I. The Verdict Was Not Coerced

Patterson first contends that the trial court's refusal to declare a mistrial after the jury twice declared itself deadlocked violated his Sixth and Fourteenth Amendment rights to due process and a fair trial. Specifically, he asserts that, under the totality of the circumstances, the trial court's rejection of the jury's declaration of impasse, along with its insensitive treatment of two jurors reporting possible work and financial issues, implicitly coerced the verdict. The record does not support his claims.

#### a. Additional Background

After eight court days for evidence and argument, the jury retired to deliberate in this case at approximately 3:30 p.m. on August 17, 2016. They went home less than 30 minutes later, and then returned to deliberate on August 18 and August 19. On August 18, the jury received several pieces of evidence it asked to review. In response to jury requests, the court reporter read back selected trial testimony on August 19. In addition, the court answered 10 jury questions involving evidentiary and legal issues.

Deliberations resumed on the next court day, August 22. Around noon, the court received a note from the jury, stating: "We are at a stalemate. Can the Court please advise on further steps." The court denied defense counsel's request for a mistrial. It noted that there had been "two and a half days of deliberations, and most of the time they have been waiting for answers to

6

questions or in reread. Literally that is over 50 percent of the time." Instead, because the court had promised to excuse juror No. 8 for a prepaid vacation after August 22, the court excused the jury for the day, excused juror No. 8, and replaced that juror with an alternate.

On August 23, the court noted the change in the jury and admonished the jurors they were now required to begin their deliberations again from the beginning. The court instructed the jury not to hesitate to repeat a question or reread request if that would be helpful, and testimony requested by the jury was reread by the court reporter that afternoon. Deliberations continued through August 24, with further testimony read back by the court reporter.

Another readback occurred during the morning on August 25. Around noon that same day, the jury indicated to the court that it was "at another impasse." In discussions with counsel, the court indicated that August 23 had been a shortened day and there had been some rereads on both August 23 and 24. It then called the jury in, asking the foreperson whether the jury had unanimously agreed on anything. After the foreperson responded in the negative, the court admonished the jury as follows: "I would ask all of you to still keep an open mind, continue to discuss and deliberate with the other members of the jury, looking at all the evidence and how it fits. [¶] If there is anything I can do in terms of further questions answered, reread, let me know. Other than this suggestion at this point, I cannot think of anything else I can do to assist."

Defense counsel renewed his request for a mistrial, which the court again denied. The court concluded that the earlier jury had deliberated no more than one-third of the time and that the reconstituted jury appeared to be taking the admonition to start anew very seriously. The court also noted that the jury stated it had reached "*another* impasse," suggesting it might

7

have made progress from whatever had deadlocked the earlier jury.  The court also noted that it was "fairly early" in the deliberations.

The next court day, August 26, the court reporter conducted a readback in the morning.  At 1:30 p.m., the court returned the jury to the courtroom to answer a question about an exhibit, ultimately excusing the jury for the remainder of the day.  The court, however, asked two jurors to remain behind to discuss their notes.  Speaking to each juror individually, the court first responded to juror No. 10's note that he had been asked to return to work by Monday, August 29.  When the court stated, "We need you here still," the juror replied, "I understand that.  I was just requested, if possible, to at least drop a note and see."  The court responded:  "If there's further issues, I'm happy to keep an open mind.  I understand that . . . the length of deliberations has probably surprised people.  [¶]  If there's further problems, let me know, I will consider anything.  But as a general request at this point, just come back on Monday at 10:00 o'clock."

The court then spoke to juror No. 6, who had reported:  "Work stops paying me after three weeks, so after Friday, August 26, I will not be able to continue to deliberate and not get paid."  The court explained that "[w]e're in a situation where we would hope you could forgo some period . . . of time without pay" and asked whether the juror was "actually requesting a financial hardship or just letting us know this is a problem."  After the juror responded, "Just letting you know that it's a problem," the court stated, "When it becomes such a problem that you are requesting a financial hardship for us to talk about it, you'll have to give us another note.  Otherwise, see you at 10:00 o'clock on Monday."  The jury then resumed its deliberations on August 29, 30, and 31—asking two questions and requesting

8

a readback—until it announced midday on September 1, 2016, that it had reached a verdict.

### *b. The Trial Court's Actions Were Not Improper*

A jury cannot be discharged without having rendered a verdict unless, "at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." (§ 1140; see *People v. Brooks* (2017) 3 Cal.5th 1, 88 (*Brooks*).) A court must take care to exercise its power under section 1140 " 'without coercing the jury into abdicating its independent judgment in favor of considerations of compromise and expediency.' " (*People v. Debose* (2014) 59 Cal.4th 177, 209 (*Debose*).) However, " 'the court may direct further deliberations upon its reasonable conclusion that such direction would be perceived " 'as a means of enabling the jurors to enhance their understanding of the case rather than as mere pressure to reach a verdict on the basis of matters already discussed and considered.' " ' " (*Ibid.*)

" 'The decision whether to declare a hung jury or to order further deliberations rests in the trial court's sound discretion.' " (*Brooks*, *supra*, 3 Cal.5th at p. 88; see *People v. Valdez* (2012) 55 Cal.4th 82, 159 (*Valdez*).) Thus, a trial court is not required to take a jury's claim of deadlock at face value. Rather, even where the jury has deliberated for a substantial period of time and indicates it is unable to reach a verdict, the trial court still retains discretion to require further deliberation. (See *People v. Sandoval* (1992) 4 Cal.4th 155, 194–197 (*Sandoval*) [citing cases].)

In analyzing a claim of coercion, the relevant inquiry is whether the trial court's comments "impose[d] such pressure on jurors to reach a verdict" that "the accuracy and integrity of the jury's stated conclusion" cannot be assured. (*People v. Gainer* (1977) 19 Cal.3d 835, 850, disapproved on another point in *Valdez*, *supra*, 55 Cal.4th at p. 163; see *People v. Peoples* (2016)

9

62 Cal.4th 718, 783 ["Coercion occurs where 'the trial court, by insisting on further deliberations, expresse[s] an opinion that a verdict should be reached.' "].) The question of coercion depends "on the facts and circumstances of each case." (*Sandoval*, *supra*, 4 Cal.4th at p. 196; accord *Brooks*, *supra*, 3 Cal.5th at p. 88.) A defendant's right to due process is violated if a trial court coerces jurors into reaching a verdict. (*Jiminez v. Myers* (9th Cir. 1993) 40 F.3d 976, 979 (*Jiminez*).)

After the jury's first declaration of impasse, the trial court replaced a juror who had a preplanned vacation with an alternate and instructed the jury to begin its deliberations anew.[4] The trial court concluded that the jury took its admonition to start again "very seriously," noting that the jury "wanted all their questions back so they could reevaluate." Thus, when the reconstituted jury declared an impasse midday on August 25, it had only been deliberating for two and a half days. Moreover, as the trial court noted, August 23 had been a shortened day and there had been some rereads on both August 23 and 24. Under the circumstances, we see no abuse of discretion in the trial court's decision to continue deliberations in this serious case.

Nor do we see any coercion. The court imposed no pressure on the jury to secure a verdict. It simply asked the jury to deliberate further and indicated a willingness to help in any way it could. In addition, since the trial court was unaware of the numerical division of the jury, the court's request that the jury continue deliberating cannot be seen as an attempt to coerce any particular holdout jurors. (Compare *Jiminez*, *supra*, 40 F.3d at pp. 980–981 [finding trial court's instruction to a deadlocked jury to continue deliberating amounted to undue coercion where the court elicited the

---

[4] Patterson does not challenge the propriety of this excusal.

progression in the voting, expressed its approval of that progression, and effectively instructed the jurors to make every effort to reach a unanimous verdict].)

The trial court's treatment of the two jurors with potential employment and financial issues is no more problematic. Neither juror pushed for excusal. Moreover, the court made clear to both that they could revisit the issue if an actual hardship arose and that it would consider their concerns. The jurors did not renew their requests during the next three and a half days of deliberations. And, indeed, the fact that active deliberations continued during this timeframe suggests that the jury had overcome whatever impasse it had reached earlier. (*Debose*, *supra*, 59 Cal.4th at p. 209; *People v. Cook* (2006) 39 Cal.4th 566, 615–616.) In short, directing further deliberations was an appropriate " ' " 'means of enabling the jurors to enhance their understanding of the case.' " ' " (*Debose*, at p. 209; see *People v. Johnson* (2015) 61 Cal.4th 734, 770 [no coercion where "[t]he trial court never indicated a preference for a particular verdict, it did not exert pressure on any juror, nor did it express any exasperation about the jury's deliberations"].)

## II.    Claims of Prosecutorial Misconduct

Patterson next contends that the prosecutor committed prejudicial misconduct in violation of his state and federal constitutional rights to due process and a fair trial. " 'The standards governing review of misconduct claims are settled. "A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' " ' " (*People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1266.) " 'Prosecutorial

11

misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury.' " (*People v. Jablonski* (2006) 37 Cal.4th 774, 835.)

However, "[m]isconduct that does not constitute a federal constitutional violation warrants reversal only if it is reasonably probable the trial outcome was affected." (*People v. Shazier* (2014) 60 Cal.4th 109, 127.) Moreover, " 'a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety,' " where such a request would not have been futile. (*People v. Stanley* (2006) 39 Cal.4th 913, 952; *People v. Hill* (1998) 17 Cal.4th 800, 820, overruled on another ground in *Price v. Superor Court* (2001) 25 Cal.4th 1046, 1069, fn.13.) We conclude that Patterson has forfeited both of his misconduct claims.

Patterson contends on appeal that the prosecutor improperly appealed to the passions of the jury by presenting Ms. Pavon in a sympathetic light. He points to many sympathetic facts about the victim that the prosecutor elicited during her examination of witnesses and underscored during closing argument. For example, when questioning Ms. Pavon's daughters regarding their mother, the daughters testified that Ms. Pavon's husband was an Oakland firefighter who had died in 2002; that their mother did her own finances and drove her own car, but had recently been having some problems with one of her hips; that she got her hair done every Thursday; that she was in a happy mood and looking forward to a family trip to Disneyland before her death; that she was reading a romance novel about a firefighter when she was shot; and that her companion, a dog named Nikki, was with her when

she died.  During closing, the prosecutor reiterated many of these facts and described Ms. Pavon as having been murdered while "sitting on her couch, in her jammies, reading a romance novel about a fireman, next to her elderly dog, her old border collie Nikki."

" ' "It is, of course, improper to make arguments to the jury that give it the impression that 'emotion may reign over reason,' and to present 'irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response.' " ' " (*People v. Vance* (2010) 188 Cal.App.4th 1182, 1192.)  Thus, " '[i]t has long been settled that appeals to the sympathy or passions of the jury are inappropriate at the guilt phase of a criminal trial.' " (*Ibid*.; see *People v. Jackson* (2009) 45 Cal.4th 662, 691 [" 'an appeal for sympathy for the victim is out of place during an objective determination of guilt' "].)  We need not determine, however, whether the prosecutor's conduct in this case rose to the level of misconduct under the standard here articulated because, as Patterson acknowledges, defense counsel did not object to the prosecutor's line of questioning or her closing argument on this basis and has therefore forfeited the issue.  Further, nothing in the record indicates an objection would have been futile or that curative action would have been ineffective, and Patterson does not argue otherwise.

Patterson suggests that we exercise our discretion to nevertheless reach the merits of his misconduct claim (see *People v. Williams* (1998) 17 Cal.4th 148, 161–162, fn. 6), but we decline to do so.  Defense counsel, himself, underscored Ms. Pavon's status as a sympathetic victim, stating in closing that the case was about "a beloved person who was injured who did nothing to provoke it and whose family members . . . suffered tremendous losses, without any provocation or anticipation of that."  Later, he reiterated:

13

"Ms. Pavon was an incredible mom and an incredible person. She had an active life. She had a future even at her age. She was planning to do things with her family." But he stressed that "sympathy, which is human and understandable, . . . has to be left behind at this stage." He then urged the jury to follow the court's instructions and look at the facts, arguing that the only thing tying Patterson to the crime was the testimony of Harris, which was "simply not believable."

Defense counsel appears to have pursued a strategy of embracing the fact that Ms. Pavon was a sympathetic victim who was tragically killed, while at the same time distancing Patterson from the crime. And, indeed, this apparent tactical decision seems to have been at least partly successful given the jury's failure to find that Patterson was the shooter, despite Harris's testimony to the contrary. The decision "whether to object is inherently tactical." (*People v. Williams* (2017) 7 Cal.App.5th 644, 686 (*Williams*); see *People v. Riel* (2000) 22 Cal.4th 1153, 1197 ["competent counsel may often choose to forgo even a valid objection"].) Patterson may not now complain of conduct by the prosecutor that his trial counsel adopted for his own ends.

Patterson's second claim—that the prosecutor's frequent references to the charged homicide as a "murder" constituted prosecutorial misconduct—is also forfeited. During the examination of witnesses throughout the trial, the prosecutor referred to the killing of Ms. Pavon as a "murder" over 90 times. For example, when questioning Harris, the prosecutor asked him if he had gloves on before Ms. Pavon's "murder" and repeatedly questioned him about other crimes committed before Ms. Pavon's "murder." Our high court has held that a "killing" should not be "characterized as 'murder' in advance of a verdict so finding." (*People v. Garbutt* (1925) 197 Cal. 200, 209 (*Garbutt*); see *People v. Price* (1991) 1 Cal.4th 324, 480 (*Price*) ["Although it would be

14

improper for a prosecutor to use the term 'murder' in questioning a witness about an unadjudicated killing, a prosecutor is of course free to argue to the jury, after all the evidence had been presented, that it should find that a killing was murder."].)

Defense counsel, however, never objected to the prosecutor's use of the murder descriptor, forfeiting the argument, and we decline to exercise our discretion to reach the merits of the claim. This is precisely the type of situation that could have been remedied by an early objection, giving the trial court the opportunity to halt the practice or at least avoid any misunderstanding over the prosecutor's use of the term "murder." (See, e.g., *Garbutt*, *supra*, 197 Cal. at p. 209 [finding no improper influence on jury from use of the term "murder" where an objection was made, and the jury was promptly admonished]; see also *Williams*, *supra*, 7 Cal.App.5th at p. 686; *People v. Taylor* (1982) 31 Cal.3d 488, 496 ["A timely objection allows the court to remedy the situation before any prejudice accrues."].) Moreover, it seems likely defense counsel did not lodge such an objection in this case because, as discussed above, the defense did not dispute that Ms. Pavon had been murdered, arguing instead that Patterson was not involved in the killing. (Compare *People v. Hines* (1997) 15 Cal.4th 997, 1045 [where defendant did not dispute victims had been murdered, but denied he was the murderer, counsel was not ineffective for failing to object to prosecutor's repeated references to victims' deaths as "murders" because there was no reason to do so]; *ibid.* [concluding, given evidence that the victims "were shot at close range in the course of a burglary" that "it would have been absurd for defendant to argue that the killings were not murders"].)

Indeed, during defense counsel's closing argument, he acknowledged the heinous nature of Ms. Pavon's murder, suggesting that the jury must

15

nevertheless look to the evidence in determining whether Patterson should be held accountable. He stated, for example: "You saw some of the most horrible things that you'll ever see in this case, a woman on a couch, reading a romance novel, who has been murdered. You heard from the doctor, the medical examiner, you heard from the family members and saw pictures of Ms. Pavon in life through the testimony of family members, you saw Ms. Pavon in death through the autopsy photos. [¶] . . . [¶] Those are about the results of the murder, ladies and gentlemen. It is not about who is guilty, however, of the murder. It's not about the law that overrides this case. We must be very careful in looking at the result in order to try and achieve a conviction, as opposed to actually looking at the evidence as the law requires you to do in order to see how or why or under what circumstances the death was obtained." It is hard to discern any possible prejudice under the circumstances. (Compare *Price*, *supra*, 1 Cal.4th at p. 480 [finding no prejudice from use of term "murder" where the evidence "plainly supported a finding of murder, and the defense, while attacking the credibility of the prosecution's witnesses, did not present any affirmative evidence to support a finding that the killing was self-defense or manslaughter"].) We see no basis to reach the merits of Patterson's claim.

Patterson finally asks that we consider cumulative prejudice in viewing the impact of the alleged trial errors he has asserted on appeal. However, since we have identified no errors in the proceedings below, there is nothing here to cumulate. (See *People v. Griffin* (2004) 33 Cal.4th 536, 600, disapproved on another ground as stated in *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32.)

## III.   Patterson Has Forfeited His *Dueñas* Challenges

At sentencing in this matter, the trial court ordered Patterson to pay certain fines, fees, and assessments, including a $250 probation investigation fee (§ 1203.1b); a $60 court facilities assessment (Gov. Code, § 70373); an $80 court operations assessment (§ 1465.8); and a $10,000 restitution fine (§ 1202.4, subd. (b)).  In addition, the court ordered direct restitution in the amount of $6,414.09 to be paid into the restitution fund pursuant to section 1202.4, subdivision (f).  Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), Patterson argues that the trial court erred by imposing these various exactions without determining his ability to pay.  We decline to reach these forfeited claims.[5]

First, we will not consider any challenge to the trial court's order with respect to direct victim restitution under section 1202.4, subdivision (f).  As the Attorney General points out, although Patterson mentions this award in his briefing, it is unclear that he is contesting it.  Courts addressing the issue have "distinguished between direct victim restitution that reimburses victims for economic losses caused by a defendant's conduct and the restitution fine

---

[5] There is considerable disagreement among appellate courts regarding whether *Dueñas* was correctly decided.  "Although several Courts of Appeal have adopted [the *Dueñas*] due process analysis, others have concluded *Dueñas* was wrongly decided or that an Eighth Amendment analysis under the excessive fines clause is doctrinally preferable." (*People v. Belloso* (2019) 42 Cal.App.5th 647, 649 (*Belloso*) [recognizing split of authority and reaffirming *Dueñas*], review granted Mar. 11, 2020, S259755; see *People v. Hicks* (2019) 40 Cal.App.5th 320, 326–329 [rejecting *Dueñas*], review granted Nov. 26, 2019, S258946; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1061, 1067–1070 [rejecting *Dueñas* but concluding a challenge to imposition of fines and fees should be analyzed under the excessive fines clause].)  The Supreme Court has granted review in a case likely to resolve these disputes.  (See *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.)  Because we decline to reach the merits of Patterson's *Dueñas* claims, we need not wade into this debate.

imposed to punish the defendant" and have declined to extend the rule announced in *Dueñas* to direct victim restitution. (*Belloso*, *supra*, 42 Cal.App.5th at p. 658, fn. 8; see *People v. Abrahamian* (2020) 45 Cal.App.5th 314, 338; *People v. Evans* (2019) 39 Cal.App.5th 771, 777.)

Patterson's *Dueñas* argument does not attempt to address this important distinction. In fact, it provides no reasoned analysis of any kind with respect to the application of *Dueñas* to direct victim restitution. We conclude that Patterson has failed to raise the issue in a manner sufficient to warrant our appellate consideration. (*People v. Stanley* (1995) 10 Cal.4th 764, 793 [where no " 'legal argument with citation of authorities' " is furnished on a particular point, " 'the court may treat it as waived, and pass it without consideration' "].)

Turning to the $10,000 restitution fine at issue, section 1202.4 requires the imposition of such a fine upon conviction of a crime, unless the court "finds compelling and extraordinary reasons for not doing so." (§ 1202.4, subd. (b).) The minimum restitution fine for felony convictions is $300, and the maximum fine is $10,000. (*Id.*, subd. (b)(1).) The statute expressly provides that "[a] defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine." (*Id.*, subd. (c).) However, "[i]nability to pay may be considered . . . in increasing the amount of the restitution fine in excess of the minimum fine pursuant to paragraph (1) of subdivision (b)." (*Ibid.*) The burden of demonstrating such inability to pay lies with the defendant. (*Id.*, subd. (d); see *People v. Castellano* (2019) 33 Cal.App.5th 485, 490 ["Consistent with *Dueñas*, a defendant must in the first instance contest in the trial court his or her ability to pay."].)

Here, Patterson concedes he did not object to imposition of the maximum restitution fine. Such an objection clearly would not have been futile as trial courts are statutorily authorized to consider a defendant's inability to pay any restitution fine above the statutory minimum. (§ 1202.4, subds. (c) & (d).) Accordingly, we conclude that Patterson forfeited any challenge to the restitution fine. (See *People v. Smith* (2020) 46 Cal.App.5th 375, 395 (*Smith*) [failure to object to imposition of maximum restitution fine on inability-to-pay grounds resulted in forfeiture of claim]; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1032–1033 (*Gutierrez*) [same, noting that "even before *Dueñas* a defendant had every incentive to object to imposition of a maximum restitution fine based on inability to pay'"]; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154 (*Frandsen*) [same].)

Moreover, several courts have held that, where a defendant does not object to imposition of the maximum restitution fine on grounds of inability to pay, such failure also forfeits claims of inability to pay "much smaller" criminal assessments. (*Smith*, *supra*, 46 Cal.App.5th at p. 395; see *Gutierrez*, *supra*, 35 Cal.App.5th at p. 1033 ["As a practical matter, if Gutierrez chose not to object to a $10,000 restitution fine based on an inability to pay, he surely would not complain on similar grounds regarding an additional $1,300 in fees."]; *Frandsen, supra,* 33 Cal.App.5th at p. 1154 ["Given his failure to object to a $10,000 restitution fine based on inability to pay, Frandsen has not shown a basis to vacate assessments totaling $120 for inability to pay."].) We agree. Unlike the *Duenas* defendant, Patterson had a statutory right to an ability-to-pay hearing that he did not exercise, thus forfeiting his appellate claim that such a hearing was required. Had he requested such a hearing, the same evidence relevant to his inability to pay the $10,000 restitution fine could also have established an inability to pay these smaller

19

assessments. We thus conclude that Patterson has forfeited the opportunity to raise an ability-to-pay challenge with respect to the court facilities and court operations assessments imposed under section 1465.8 and Government Code section 70373.[6]

## DISPOSITION

The judgment is affirmed.

---

[6] To the extent that Patterson is also contesting imposition of the $250 probation investigation fee pursuant to section 1203.1b on grounds of ability to pay, this issue is similarly forfeited. That statute expressly provides for an ability-to-pay hearing at the request of the defendant, and Patterson was advised of this fact but declined to pursue the matter. (*People v. Snow* (2013) 219 Cal.App.4th 1148, 1151 [ability-to-pay challenge to costs of presentence investigation report subject to forfeiture rule].)

_____
Sanchez, J.


WE CONCUR:


_____
Margulies, Acting P. J.


_____
Banke, J.


*A156047  People v. Patterson*

21